**KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Plaintiffs–Appellees,**

and

**Isuzu Motors, Ltd. and American Isuzu Motors, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**The Timken Company, Defendant–Appellant.**

**KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Inc., Plaintiffs–Appellees,**

and

**Isuzu Motors, Ltd. and American Isuzu Motors, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant–Appellant,**

and

**The Timken Company, Defendant.**

Nos. 93–1525, 93–1534.

United States Court of Appeals, Federal Circuit.

Sept. 30, 1994.

.Susan P. Strommer, Powell, Goldstein, Frazer & Murphy, Washington, DC, argued, for plaintiffs-appellees. With her on the brief was Peter O. Suchman. Of counsel were T. George Davis and Elizabeth C. Hafner.

George Kleinfeld, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, DC, for plaintiffs.

Velta A. Melnbrencis, Dept. of Justice, Washington, DC, argued, for defendant. Of counsel were David M. Cohen, Dept. of Justice, Stephan J. Powell, Joan McKenzie, Berniece Browne and Linda S. Chang, Dept. of Commerce.

Geert DePriest, Stewart & Stewart, Washington, DC, argued, for defendant-appellant. Terence P. Stewart, James R. Cannon, Jr. and Margaret E.O. Edozien, Stewart & Stewart, of Washington, DC, were on the brief, for defendant-appellant. Of counsel was John M. Breen.

Frederick L. Ikenson, Frederick L. Ikenson, P.C., Washington, DC, was on the brief, for amicus curiae, Federal–Mogul Corp.

Before ARCHER, Chief Judge,[*] LOURIE and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

The government and The Timken Company (Timken) each appeal the January 8, 1993 decision of the U.S. Court of International Trade (Court), *Koyo Seiko Co. v. United States*, 810 F.Supp. 1287 (Ct.Int'l Trade 1993), holding, *inter alia*, that the International Trade Administration of the Department of Commerce (Commerce) erred in calculating final dumping margins for certain entries by Koyo Seiko Company and Koyo Corporation of U.S.A. (collectively, Koyo).[1] Because the Court erred by failing to defer to Commerce's reasonable interpretation of the statutory provisions at issue, we reverse and remand with instructions.

## BACKGROUND

I. *The Calculation of Antidumping Duties*

■ Under the statutory provision governing the imposition of antidumping duties, Commerce is required to impose additional duties on imported merchandise that is being sold, or is likely to be sold, in the United States at less than fair value to the detriment of a domestic industry. 19 U.S.C. § 1673 (Supp.1993). *See Smith–Corona Group v. United States*, 713 F.2d 1568, 1571, 1 Fed. Cir. (T) 130, 132 (1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). The amount of the duty to be imposed, otherwise known as the "dumping margin," equals "the amount by which the foreign market value exceeds the United States price for the merchandise." 19 U.S.C. § 1673 (Supp. 1994). Foreign market value is typically computed on the basis of home market sales or third country sales, as appropriate. *See* 19 U.S.C. § 1677b (Supp.1993). United States price is measured by one of two methods—purchase price or exporter's sales price—depending upon the nature of the relationship, if any, between the importer and the exporter. 19 U.S.C. § 1677a (1988 & Supp.1993). Where the domestic importer is unrelated to, and independent of, the foreign producer, purchase price is used. Purchase price is "the actual or agreed-to price between the foreign producer and the independent importer, prior to the time of importation." *Smith–Corona*, 713 F.2d at 1572, 1 Fed.Cir. (T) at 133. On the other hand, where the importer and exporter are related (*e.g.*, the importing corporation is a subsidiary of the exporting corporation), the United States price is measured by the exporter's sales price, which is "the price at which the foreign manufacturer or its agent sells or agrees to sell the merchandise in the United States." *The Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 399 n. 2 (Fed. Cir.1994) (citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1577 (Fed.Cir. 1993)); 19 U.S.C. § 1677a(c) (1988). The purpose of distinguishing between purchase price and exporter's sales price is to arrive at a United States price that reflects the price that the merchandise would command in "an arm's length transaction, whether from importer to an independent retailer or directly to the public." *See Smith–Corona*, 713 F.2d at 1572, 1 Fed.Cir. (T) at 133.

---

[*] Chief Judge Archer assumed the position of Chief Judge on March 18, 1994.

1. Isuzu Motors, Ltd. and American Isuzu Motors, Inc., plaintiffs-intervenors below, are not parties to this appeal.

To ensure that the quantum of antidumping duties is calculated in a fair manner, both foreign market value and United States price are subject to certain adjustments in order to achieve a common point at which to perform the price comparison. We have explained:

> Foreign market value and United States price represent prices in different markets affected by a variety of differences in the chain of commerce by which the merchandise reached the export or domestic market. Both values are subject to adjustment in an attempt to reconstruct the price at a specific, "common" point in the chain of commerce, so that value can be fairly compared on an equivalent basis. While the statute does not specify *where* in the chain of commerce price is constructed, the specific statutory adjustments appear to indicate an "f.o.b. foreign port" price.

*Id.* at 1571–72, 1 Fed.Cir. (T) at 132 (emphasis in original).

■ Foreign market value is subject to several adjustments, including a "circumstances of sale" adjustment as provided in 19 U.S.C. § 1677b(a)(4). Circumstances of sale that have served as the basis for an adjustment to foreign market value include costs such as "advertising, warranty and after sales service, packing costs, and after sales rebates." *Smith–Corona,* 713 F.2d at 1573 n. 12, 1 Fed.Cir. (T) at 134 n. 12. United States price is adjusted according to which measure—purchase price or exporter's sales price—is used. In both purchase price and exporter's sales price transactions, the adjustment bases provided in section 1677a(d)

are available (*e.g.,* certain packaging expenses, shipping costs, duties, and taxes). The additional adjustment bases set forth in section 1677a(e), however, are applicable only to exporter's sales price transactions (*e.g.,* commissions and selling expenses "generally incurred" in the United States).

After Commerce has appropriately adjusted the foreign market value and the United States price for each entry of merchandise subject to the antidumping duty order at issue, the dumping margin—*i.e.,* the amount of the antidumping duty—is calculated by subtracting United States price from foreign market value. 19 U.S.C. § 1675(a)(2) (Supp. 1994).

As discussed in more detail below, the present dispute centers on whether certain selling expenses incurred on sales of the merchandise at issue in the United States are properly accounted for by a "circumstances of sales" adjustment to foreign market value pursuant to section 1677b(a)(4), or by an adjustment to exporter's sales price pursuant to section 1677a(e)(2).[2]

## II. *Facts of the Case*

The present appeals arise from the final results of an antidumping duty administrative review conducted by Commerce determining that certain of Koyo's tapered roller bearings (TRBs)—*i.e.,* those that entered the United States during the period August 1, 1986, through July 31, 1987—were subject to

---

2. Interestingly, either method of calculation results in an identical "absolute" dumping margin value (difference between foreign market value and United States price). What varies according to the calculation method used is "weighted-average dumping margin," which is defined as the aggregated dumping margins divided by the aggregated United States prices (in this case, the exporter's sales prices). 19 C.F.R. § 353.2(f)(2) (1994). The weighted-average dumping margin is the estimated rate at which the U.S. Customs service will collect duties on future entries until the actual dumping duties are determined in a future administrative review. *See* 19 C.F.R. § 353.21(b) (1994) (specifying that an antidumping duty order shall instruct the U.S. Customs Service to "require a cash deposit of estimated antidumping duties equal to the amount of the estimated weighted-average dumping margin"

for each entry of merchandise); 19 C.F.R. § 353.22 (1994) (outlining procedures for requesting and conducting administrative review, including recalculation of weighted-average dumping margin). *See also Al Tech Specialty Steel Corp. v. United States,* 745 F.2d 632, 634–36, 3 Fed.Cir. (T) 1, 4–5 (1984) (discussing antidumping duty assessment and collection procedures). In the present case, the calculation method approved by the Court results in a lower weighted-average dumping margin than under the calculation method advanced by Commerce, thus resulting in the collection of a lesser amount of estimated antidumping duties. This is because, under Commerce's approach, the figure for aggregated United States prices, by which aggregated dumping margins are divided, is smaller (because of deductions therefrom) than under the Court's approach.

a dumping margin of 52.17% ad valorem.[3] The administrative review was conducted upon request of the parties, pursuant to 19 U.S.C. § 1675(a), to definitively determine the amount of antidumping duties owed by Koyo on the subject merchandise.

Because Koyo Seiko Company and Koyo Corporation of U.S.A. represent a related exporter-importer pair, Commerce utilized the exporter's sales price of the merchandise in calculating the dumping margin. After calculating an initial exporter's sales price, Commerce adjusted that value, *inter alia*, pursuant to section 1677a(e)(2) by deducting therefrom all selling expenses (both "direct" and "indirect"[4]) incurred in making U.S. sales.[5] After calculating a foreign market value, and performing other adjustments and calculations not at issue in this appeal, Commerce calculated the dumping margin, pursuant to 19 U.S.C. 1675(a)(2), by subtracting exporter's sales price from foreign market value.

Pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii), Koyo filed suit in the Court of International Trade to challenge the methodology used by Commerce in calculating the dumping margin for the TRB entries at issue. In particular, Koyo asserted that Commerce abused its discretion in deducting Koyo's direct selling expenses from exporter's sales price. Instead, Koyo argued, Commerce should have added the direct selling expenses to foreign market value as a "circumstances of sale" adjustment pursuant to 19 U.S.C. § 1677b(a)(4). The Court agreed. Relying on a line of its cases that had "interpreted section 1677a(e) to refer to indirect rather than direct selling expenses,"[6] the Court held that reductive adjustments of exporter's sales price under 19 U.S.C. § 1677a(e)(2) were limited to indirect selling expenses. *Koyo Seiko*, 810 F.Supp. at 1292. Further, the Court noted that its precedent "repeatedly held that 'direct selling expenses are properly characterized as differences in circumstances of sale' which may adjust foreign market value." *Id.* Concluding that Commerce's calculation methodology was improper as being contrary to established law, the Court remanded the case to Commerce "for recalculation of exporter's sales price, without an adjustment for direct selling expenses[, and for recalculation of] foreign market value to reflect an adjustment for direct selling expenses." *Id.* Timken and the government each challenge the Court's decision.[7]

## DISCUSSION

### I. *Standard of Review*

No facts are in dispute. The sole issue before us is whether the Court of International Trade erred in concluding that Commerce, in calculating the dumping margin, may not deduct direct selling expenses in-

---

**3.** *Tapered Roller bearings Four Inches or Less in Outside Diameter and Certain Components Thereof From Japan*, 55 Fed.Reg. 38,720 (Dep't Comm. 1990) (final admin. review).

**4.** Direct selling expenses are "expenses which vary with the quantity sold, such as commissions." *Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc.*, 753 F.2d 1033, 1035, 3 Fed. Cir. (T) 83, 84–85 (1985). In contrast, indirect selling expenses are those that do not vary with the quantity sold, "*e.g.*, overhead." *See Id.*

**5.** In other words, the United States price for each entry was reduced by Koyo's direct selling expenses incurred in the United States. Consequently, the aggregated United States prices for Koyo's entries were also reduced, thereby resulting in an *increased* weighted-average dumping margin. *See* 19 C.F.R. § 353.2(f)(2). Because the weighted-average dumping margin equals the amount of estimated duties collected for each offending entry of merchandise, 19 C.F.R. § 353.21(b), an increased weighted-average dumping margin meant that higher estimated duties would be imposed on Koyo.

**6.** *See Timken Co. v. United States*, 673 F.Supp. 495, 511 (Ct.Int'l Trade 1987); *NTN Bearing Corp. of Am. v. United States*, 747 F.Supp. 726, 738–39 (Ct.Int'l Trade 1990); *Koyo Seiko Co. v. United States*, 796 F.Supp. 1526, 1531 (Ct.Int'l Trade 1992).

**7.** The United States was the named defendant in Koyo's action filed in the Court of International Trade challenging the results of Commerce's administrative review. Timken was aligned as a defendant in that proceeding after its motion to intervene was granted. Although the government and Timken each appeal in a separate capacity, both parties agree that the two appeals arise from the same administrative order and judicial determination, and concern the same issue. Accordingly, we address both appeals in this single opinion.

curred on U.S. sales of the subject merchandise from the exporter's sales price pursuant to 19 U.S.C. § 1677a(e)(2), but rather must add the direct selling expenses to the foreign market value as a "circumstances of sale" adjustment pursuant to 19 U.S.C. § 1677b(a)(4). In reviewing a judgment of the Court of International Trade, this court decides *de novo* the proper interpretation of the governing statutory provisions. *St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763, 767 (Fed.Cir.1993). Our review is guided, however, by the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), which states:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute (footnotes omitted).

To survive judicial scrutiny, an agency's construction need not be the *only* reasonable interpretation or even the *most* reasonable interpretation. *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978). Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another. *Id.* Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws. *Daewoo Elecs. Co. v. United States,* 6 F.3d 1511, 1516 (Fed.Cir.1993), *cert.*

denied, —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994).

## II. *Analysis*

### A.

Our analysis begins with an examination of the relevant statutory provisions. *See VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574, 1579 (Fed.Cir.1990) ("It is axiomatic that statutory interpretation begins with the language of the statute."), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). In pertinent part, the provision governing adjustments to foreign market value states:

> In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to
>
> \*  \*  \*  \*  \*  \*
>
> (B) other *differences in circumstances of sale*
>
> \*  \*  \*  \*  \*  \*

then due allowance shall be made therefor. 19 U.S.C. § 1677b(a)(4) (Supp.1994) (emphasis added). The provision governing adjustments to exporter's sales price states in pertinent part that

> the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of
>
> \*  \*  \*  \*  \*  \*
>
> (2) *expenses generally incurred* by or for the account of the exporter in the United States *in selling* identical or substantially identical merchandise....

19 U.S.C. § 1677a(e) (1988) (emphasis added). Due to the fact that the exporter and importer are related in this case, there is no question that exporter's sales price is the proper measure of United States price for calculating the dumping margin. Nor is there any question that the expenses incurred by Koyo in selling the merchandise in the United States are direct, as opposed to indirect, selling expenses. Rather, the dispute centers on which of the two above-referenced adjustment provisions is the prop-

er vehicle to account for the selling expenses. On this point the plain language of the statutory provisions, when read together, is inconclusive.

■ On the one hand, it is clear that the "circumstances of sale" in section 1677b(a)(4) may include direct selling expenses. Indeed, the government concedes that direct selling expenses are considered, at least in purchase price transactions, to be "differences in circumstances of sale" and are used, as appropriate, to adjust foreign market value pursuant to section 1677b(a)(4).[8] On the other hand, we see no basis for concluding that the operative phrase appearing in the exporter's sales price provision, "expenses generally incurred ... in selling [the] merchandise," 19 U.S.C. § 1677a(e)(2), may not include direct selling expenses incurred in making U.S. sales. The dictionary definitions proffered by Timken support the view that an undifferentiated reference to "selling expenses" includes both the direct and the indirect varieties.[9] In addition, there is no suggestion in the legislative history of the statute that, in the context of adjustments to exporter's sales price under section 1677a(e)(2), Congress meant the phrase "expenses generally incurred" to exclude direct selling expenses. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 1 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 387 (hereafter, *S.Rep.*); H.R.Rep. No. 317, 96th Cong., 1st Sess. 1 (1979) (hereafter, *H.R.Rep.*). To the contrary, because the same legislative history shows that Congress embraced the distinction between indirect and direct selling expenses in another context, *see H.R.Rep.* at 76 (adjustments to foreign market value are proper if they are, *inter alia,* "directly related to the sales un-

der consideration"), one might infer that Congress purposely avoided such a distinction in the context of determining exporter's sales price.

## B.

Because the plain language of the statute is not dispositive, we turn to the legislative history behind the adjustment provisions to determine whether Congress has "directly addressed the precise question at issue." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. *See also Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 667 (Fed.Cir.1992) (attempting to discern intent of Congress from legislative history).

In its earliest form, the antidumping law distinguished between "purchase price" and "exporter's sales price" for purposes of calculating antidumping duties. *See* Antidumping Act of 1921, ch. 14, §§ 203–04, 42 Stat. 12–13 (hereafter, "the 1921 Act"). "Exporter's sales price" was defined as "the price at which such merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter...." *Id.* § 204. Then, as now, the administering authority was authorized to make certain adjustments to exporter's sales price, including deductions of "an amount equal to the expenses, if any, generally incurred by or for the account of the exporter in the United States in selling identical merchandise." *Id.* The purpose of deducting selling expenses from exporter's sales price was to estimate the "net amount returned to the foreign exporter"—*i.e.,* the f.o.b. foreign port price—of the merchandise by removing all of the expenses incurred

---

8. *See also* 19 C.F.R. § 353.56(a) (1994), which authorizes adjustments to foreign market value if the circumstances of sale "bear a direct relationship to the sales compared." Examples provided in the regulation include "differences in commissions, credit terms, guarantees, warranties, [and] technical assistance," as well as servicing, and certain advertising.

9. Under basic principles of statutory interpretation, undefined terms in a statute are deemed to have their ordinarily understood meaning. *See, e.g., United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 3020, 92 L.Ed.2d 483 (1986) ("[W]e assume that the legislative purpose is

expressed by the ordinary meaning of the words used.") (alteration in original) (quoting *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982)). A dictionary is an appropriate source for gleaning that "ordinary meaning." *See, e.g., Board of Educ. v. Mergens,* 496 U.S. 226, 237, 110 S.Ct. 2356, 2365, 110 L.Ed.2d 191 (1990). In the present case, Estes, *Dictionary of Accounting* 124 (2d ed. 1992), defines "selling expense" as including various direct expenses such as those incurred in "promotion, marketing, and distribution activities; examples include advertising, sales commissions, and product shipping costs."

after importation by the related-party importer. *Emergency Tariff and Antidumping: Hearings on H.R. 2435 Before the Senate Comm. on Finance,* 67th Cong., 1st Sess. 10–12 (1921). Because the 1921 Act made no provision for deducting analogous expenses from foreign market value, all selling expenses at that time—both direct and indirect—were deducted from exporter's sales price pursuant to section 204 of the 1921 Act. *See Bills to Amend Certain Provisions of the Antidumping Act of 1921: Hearings on H.R. 6006, 6007, 5102, 5120, 5138, 5139, and 5202 Before the House Ways and Means Comm.,* 85th Cong., 1st Sess. 14 (1957) (hereafter, "1957 House Hearings") (explaining that under the 1921 Act, exporter's sales price was adjusted, *inter alia,* by "subtract[ing] from it the commissions and selling expenses incurred in selling the product for delivery in the United States").

In 1958, the Antidumping Act was amended to permit adjustments to foreign market value for "differences in circumstances of sale." Act of August 14, 1958, Pub.L. No. 85–630, § 2, 72 Stat. 583 (hereafter, "the 1958 Act"). A memorandum provided by the Treasury Department (Treasury) [10] explained the effect of the amendment with respect to one type of direct selling expense, advertising costs, as follows:

> The amendment would require that the amounts expended by the manufacturer for advertising in connection with his sales to the United States be added to his home market price for the purpose of determining foreign market value; ... if the manufacturer paid advertising costs in the home market but not in the United States, the advertising costs would be deducted from the home market price in determining foreign market value.

10. Pursuant to a congressional directive contained in the Customs Simplification Act of 1956, Pub.L. No. 927, § 5, 84th Cong., 2d Sess., 70 Stat. 943, 948, the 1958 amendments to the Antidumping Act were drafted by the Treasury Department.

11. A counterpart memo, submitted during the House hearings on the 1958 Act, dealt with a similar example, in which a foreign manufacturer paid for the American dealers' advertising

*An Act to Amend Certain Provisions of the Antidumping Act: Hearings on H.R. 6006 Before the Senate Comm. on Finance,* 85th Cong., 2d Sess. 17 (1958) (Explanatory Memorandum submitted by Hon. A. Gilmore Flues, Assistant Secretary of the Treasury).[11] Subsequently, in 1979, the Antidumping Act was recodified generally into the form that it is today. *See* 19 U.S.C. § 1673 *et seq.* (1988 & Supp.1994).

Koyo asserts that the explanatory memoranda submitted in support of the 1958 Act unequivocally evince a legislative intent that the circumstances of sale provision introduced thereby was intended to be the sole mechanism through which direct selling expenses were treated, in both purchase price and exporter's sales price transactions. We disagree. Although the memoranda clearly explain the effect of the circumstances of sale provision for the particular purchase price situations discussed therein, they contain no suggestion of what effect, if any, the added provision would have on the definition under the 1921 Act of exporter's sales price, which was not changed by the 1958 Act. There can be no doubt that the drafters of the 1958 Act were aware of the current practice with regard to exporter's sales price, which, as noted above, required a reduction for all selling expenses—both direct and indirect. "It can be presumed that Congress is knowledgeable about existing law pertinent to legislation it enacts." *VE Holding Corp.,* 917 F.2d at 1581. Therefore, we believe that if the drafters of the 1958 Act had wanted to depart from the existing definition of exporter's sales price by precluding adjustments thereto for direct selling expenses, they would have said so in clear and unequivocal terms. *See, e.g., United States v. International Business Machs. Corp.,* 892 F.2d 1006, 1009 (Fed.Cir.1989) ("Had Congress intended to make the exemptions permanent, it knew

costs but not for advertising in its home market. The memorandum explained that in such a case foreign market value was to be adjusted by adding such advertising costs to the home market price in order to account for the differences in circumstances of sale. *See* 1957 House Hearings, 85th Cong., 1st Sess. 32 (Explanatory Memorandum submitted by Hon. David W. Kendall, Assistant Secretary of the Treasury).

how: it could and we believe would have used words of futurity. . . ."). Because Treasury did not clearly express an intent to depart from the existing definition of exporter's sales price, we do not know what effect, if any, the 1958 Act was expected to have on situations such as the present case. Consequently, we conclude that neither the statute nor its legislative history provides an "unambiguously expressed intent," *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781, with regard to the precise question at issue. *See Suramerica,* 966 F.2d at 667 ("neither the statute nor the legislative history gives specific guidance on how Congress wished this issue to be decided").

### C.

In a situation where Congress has not provided clear guidance on an issue, *Chevron* requires us to defer to the agency's interpretation of its own statute as long as that interpretation is reasonable. We cannot say that Commerce's method of applying sections 1677a(e)(2) and 1677b(a)(4) in calculating antidumping duties for an exporter's sales price transaction is unreasonable. To the extent the Court of International Trade concluded otherwise, it committed reversible error.

■ We begin by noting that one of the purposes of the antidumping laws is to calculate antidumping duties on a fair and equitable basis. *See Smith–Corona,* 713 F.2d at 1578, 1 Fed.Cir. (T) at 140 ("One of the goals of the statute is to guarantee that the administering authority makes the fair value comparison on a fair basis—comparing apples with apples."); *Consumer Prods.,* 753 F.2d at 1037, 3 Fed.Cir. (T) at 87 ("one of the goals of the statute [is to achieve] a *fair* comparison between foreign and domestic market prices or values."). To this end, as long as Commerce's application of the adjustment provisions at issue are not arbitrary or illogical, we must uphold its construction even if the approach supported by the Court of International Trade is even more fair or logical. *Consumer Prods.,* 753 F.2d at 1039, 3 Fed. Cir. (T) at 90.

In the present case, it appears that Commerce's approach is intended to effect an "apples with apples" comparison. More particularly, Commerce's practice evidences an attempt to make mirror-image adjustments to foreign market value and exporter's sales price so that they can be fairly compared at the same point in the chain of commerce. The procedure is as follows: In an exporter's sales price transaction, after an initial exporter's sales price is calculated, that value is adjusted, *inter alia,* pursuant to section 1677a(e)(2) by deducting therefrom all selling expenses (both direct and indirect) incurred in making U.S. sales. Then, in determining an initial foreign market value, appropriate sales are identified in the home market or third country pursuant to 19 U.S.C. § 1677b(a). Next, the initial foreign market value is adjusted, *inter alia,* by deducting therefrom a "circumstances of sale" amount to account for "any difference between the United States price and the foreign market value," 19 U.S.C. § 1677b(a)(4), for example, direct selling expenses incurred in making home market sales. In this way, the section 1677b(a)(4) adjustment to foreign market value counterbalances the section 1677a(e)(2) adjustment to exporter's sales price. As a result, the two parameters may be compared on equivalent terms.

Koyo argues that Commerce's interpretation is unreasonable because it involves handling direct selling expenses in purchase price transactions differently than in exporter's sales price transactions. In the former, direct selling expenses are added to foreign market value, whereas in the latter, direct selling expenses are deducted from United States price. Commerce's rationale for this practice was set forth in the final results of a prior antidumping administrative review, as follows:

> This difference in treatment of [exporter's sales price] and [purchase price] transactions is necessary for several reasons. One is to avoid a systematic distortion in the amount of duties assessed, which would result if the value on which dumping margins were calculated were consistently different than the entered value upon which U.S. Customs will apply the margin. Entered value is most commonly based on the price to the United States between the exporter and the importer. Purchase

price will approximate the customs entered value without deducting any expenses because direct selling expenses are incurred in the exporting country and included in the price to the United States. In contrast, the basis of the exporter's sales price is the resale price in the United States, which can approximate entered value and be equivalent to purchase price only after all expenses incurred in the United States (including direct selling expenses) are deducted from [exporter's sales price.]

\*   \*   \*   \*   \*   \*

Another reason for the different treatment of direct selling expenses in [exporter's sales price] and [purchase price] transactions is that [United States price] must be calculated in such a way that there is no bias introduced just because there is a related importer intervening between the foreign producer and the first unrelated purchaser in the United States. Whether using [exporter's sales price] or [purchase price], we must calculate [United States price] based on the price to the first unrelated U.S. buyer, just as we must calculate [foreign market value] based on the price to the first unrelated home market buyer. In order to eliminate the effect of the relationship between the exporter and the importer, direct selling expenses must be deducted from [exporter's sales price].

*Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 58 Fed.Reg. 39729, 39778 (Dep't Comm.1993) (final admin. review). We find this rationale eminently reasonable. Commerce's interpretation accounts for the inherently different nature of purchase price and exporter's sales price. It is not surprising that Commerce feels the need to treat them differently to make a fair comparison. *Cf. Smith–Corona*, 713 F.2d at 1578, 1 Fed. Cir. (T) at 140 ("the statute does not expressly foreclose the use of two different United States price-foreign market value comparisons"). Indeed, the mere fact that Congress enacted an adjustment provision, 19 U.S.C. § 1677a(e)(2), that applies to exporter's sales price transactions, but not to purchase price transactions, lends credence to Commerce's

position that the two should not be treated in the same fashion.

Contrary to Koyo's argument, neither *Smith–Corona* nor its sequel, *Consumer Products*, compels a different result than that reached here. Those cases concerned the validity of a particular regulation known as "the Exporter's Sales Price (ESP) offset cap," 19 C.F.R. § 353.15(c) (now found at 19 C.F.R. § 353.56(b)(2) (1994)), which "limit[ed] the amount of indirect costs which may be deducted on the foreign side of the equation to the amount deducted from the U.S. price, when such price is based on [exporter's sales price]." *Consumer Prods.*, 753 F.2d at 1035, 3 Fed.Cir. (T) at 85. In explaining the holding of *Smith–Corona* (i.e., that foreign market value may be adjusted in exporter's sales price transactions differently from purchase price transactions), *Consumer Products* stated:

> The [*Smith–Corona*] court interpreted the statute as requiring that adjustments due to differences in circumstances of sale bear a direct relationship to the sales under consideration except when ESP is the basis for the U.S. price, in which case the statute specifies an additional deduction for all other selling expenses, that is, indirect expenses as well.
>
> Perceiving that use of a U.S. price based on ESP, with its additional deductions, thereby skewed the calculations in favor of a higher dumping margin, the administering authority promulgated 19 C.F.R. § 353.15(c) to afford an equivalent adjustment to foreign market value. This court held that the deduction, although not specifically authorized by the statute, was valid since it was an attempt to achieve one of the goals of the statute, a fair comparison between foreign and domestic market prices or values.

*Consumer Prods.*, 753 F.2d at 1036–37, 3 Fed.Cir. (T) at 86–87 (footnote omitted). In other words, this court merely held that, because indirect expenses were allowed to be deducted from exporter's sales price, Commerce may properly offset that deduction by a similar deduction from foreign market value as well. *Smith–Corona* and *Consumer Products* do not hold that adjustments to

exporter's sales price under section 1677a(e)(2) are limited to indirect selling expenses. Those cases did not concern adjustments to exporter's sales price, but rather dealt solely with the propriety of adjustments to foreign market value.

Moreover, in both *Smith–Corona* and *Consumer Products,* consistent with its practice, Commerce had deducted direct selling expenses from exporter's sales price in calculating the antidumping margin. *See Consumer Prods.,* 753 F.2d at 1035, 3 Fed.Cir. (T) at 85 ("From [exporter's sales price], pursuant to 19 U.S.C. § 1677a(e)(2), all expenses of [merchandise] sales in the U.S., both direct and indirect, have been deducted to arrive at the U.S. price used for comparison purposes.").[12] Therefore, because this court expressly recognized that Commerce deducted *all* selling expenses from the exporter's sales price in calculating the antidumping margin, it would be patently inconsistent to interpret the above-noted language in *Consumer Products* as standing for the proposition that adjustments to exporter's sales price under section 1677a(e)(2) are limited to indirect selling expenses. The CIT has erred to the extent that it has interpreted *Smith–Corona* and *Consumer Products* as imposing such a limitation.

Finally, the longstanding status of Commerce's practice provides a further rationale for deferring to the agency's interpretation. *See Zenith Radio Corp.,* 437 U.S. at 457–58, 98 S.Ct. at 2448–49. As noted above, Treasury, the authority administering the antidumping law under the 1921 Act, deducted both indirect and direct selling expenses from exporter's sales price, and continued to do so even after the 1958 Act went into effect.[13] In 1979 the Antidumping Act was recodified by, *inter alia,* incorporating the relevant language of the 1921 Act—*i.e.,* re-

quiring that exporter's sales price be reduced by "expenses generally incurred ... in selling [the] merchandise." 19 U.S.C. § 1677a(e)(2) (1988). It is safe to assume that Congress was aware of Treasury's practice when it stated that the recodification "would generally continue existing law with respect to the meaning of purchase price and exporter's sales price." S.Rep. at 94, 1979 U.S.C.C.A.N. at 480. We believe this statement is an implicit approval of Treasury's, and now Commerce's, interpretation of the adjustment provisions at issue.

## CONCLUSION

Nothing in the plain language or the legislative history of the Antidumping Act precludes Commerce's approach of adjusting exporter's sales price by deducting therefrom certain direct selling expenses incurred in the United States. Indeed, Commerce's stated rationale for its approach is well within the bounds of reasonableness. Moreover, because we recognize that Commerce is "the 'master' of the antidumping law, worthy of considerable deference," *Daewoo Elecs.,* 6 F.3d at 1516, we defer to its approach. Accordingly, the judgment of the Court of International Trade is reversed and the case is remanded for recalculation of exporter's sales price and foreign market value in a manner consistent with this opinion.

## COSTS

Each party shall bear its own costs.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

---

**12.** *See also Portable Electric Typewriters From Japan,* 45 Fed.Reg. 53853, 53854–55 (Dep't Comm.1980) (antidumping duty determination). In this Commerce ruling which was ultimately affirmed in *Smith–Corona,* Commerce clearly stated that it was adjusting exporter's sales price for certain direct selling expenses (*e.g.,* U.S. advertising and commissions).

**13.** *See, e.g., Portable Typewriters From West Germany,* 26 Fed.Reg. 1,413 (Dep't Treas.1961);

*Peat Moss From Canada,* 29 Fed.Reg. 439 (Dep't Treas.1964); *Television Receiving Sets, Monochrome and Color, From Japan,* 35 Fed.Reg. 18,-549 (Dep't Treas.1970); *Regenerative Blower/Pumps From West Germany,* 39 Fed.Reg. 7,188 (Dep't Treas.1974); *Railway Track Maintenance Equipment From Austria,* 42 Fed.Reg. 41,339 (Dep't Treas.1977); *Titanium Dioxide From Belgium,* 44 Fed.Reg. 47,198 (Dep't Treas.1979).