Slip Op. 05-75

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

_____

| | | |
|---|---|---|
| Dongkuk Steel Mill Co., | : | |
| Plaintiff, | : | |
| v. | : | |
| United States, | : | **Court No. 04-00190** |
| | | **Public Version** |
| Defendant, | : | |
| and | : | |
| CMC Steel Group, *et al.*, | : | |
| Defendant-Intervenors. | : | |

_____

[Plaintiff's Motion for Judgment on Agency Record denied.]

Decided: June 22, 2005

*Preston Gates Ellis & Rouvelas Meeds LLP,* (*Jeffrey M. Winton*, *Sam J. Yoon*) for Plaintiff.

*Peter D. Keisler,* Assistant Attorney General; *David M. Cohen*, Director; (*Jeanne E. Davidson*), Deputy Director, (*Stephen C. Tosini*), Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; *Philip J. Curtin*, Office of the Chief Counsel for Import Administration, Department of Commerce, of counsel, for Defendant.

*Wiley Rein & Fielding* LLP, (*Charles Owen Verrill, Jr.*), *Alan Hayden Price*, *Timothy C. Brightbill*, for Defendant-Intervenors.

## OPINION

**BARZILAY, JUDGE:**     This action is before the court on Plaintiff's motion for judgment

on the agency record pursuant to USCIT Rule 56.2.  Plaintiff, Dongkuk Steel Mill Co., Ltd.

("DSM"), challenges the final results of the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping duty order on *Steel Concrete Reinforcing Bar from the Republic of Korea*, 69 Fed. Reg. 19399 (April 13, 2004) ("Final Determination"). Defendant, United States, and Defendant-Intervenors, CMC Steep Group, Gerdau Ameristeel Corp., Nucor Corp., and Tamco Steel, submitted their briefs in opposition to Plaintiff's motion.

## I. BACKGROUND

The administrative review challenged in this action covered rebar exported from the Republic of Korea to the United States by DSM and Korea Iron and Steel Co., Ltd. ("KISCO") during the period from January 30, 2001 through August 31, 2002.[1] Commerce preliminarily determined that DSM and KISCO should be considered affiliates and collapsed the two companies into a single entity for the purpose of calculating a dumping margin. *See Steel Concrete Reinforcing Bar from the Republic of Korea: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 68 Fed. Reg. 57883 (Oct. 7, 2003). Following the comments filed by DSM, KISCO and the Rebar Trade Action Coalition, Commerce made changes in the margin calculation and determined the margin to be 11.74 % for DMS and KISCO's sales in the United States. *See Final Determination*, 69 Fed. Reg. at 19400.

In the pending motion, Plaintiff challenges Commerce's determination that DSM was affiliated with two Korean companies: KISCO and Dongkuk Industries Co., Ltd. ("DKI").[2]

---

[1]Rebar is steel used in construction and sold in straight lengths.

[2]The first prong of the collapsing regulation is an affiliation between the entities subject to collapsing. *See* 19 C.F.R. § 351.401(f)(1).

Plaintiff argues that this finding was not based on any direct ownership or relationship between DSM, KISCO and DKI, and challenges Commerce's construction of the term "affiliated persons" as defined in the Uruguay Round Agreements Act, ("URAA"), Pub.L. No. 103-465, 108 Stat. 4809 (1994). DSM also challenges Commerce's decision to collapse DSM and KISCO and treat them as a single entity for purposes of the antidumping review. Plaintiff argues that the record does not support Commerce's determination that there was a realistic potential for manipulation of price or production between the two companies.

DSM was founded by Kyung-Ho Chang, who over a period of twenty years created a group of companies involved in steel production, construction, and transportation, including KISCO and DKI. Upon Kyang-Ho Chang's death, his three sons assumed control of his companies: Sang-Tae Chang became the principal owner of DSM, Sang-Don Chang – the principal owner of KISCO, and Sang-Kuhn Chang – the principal owner of DKI. *See DSM's Feb. 3, 2003 Submission* (Confidential Doc.), at 44-45; *Letter from DSM to Commerce*, Nov. 15, 2002 (Confidential Doc.), at 2. The record shows that when the three brothers were alive, the companies functioned under substantial cross-ownership, sharing a number of common directors and officers. During Commerce's original investigation, DMS still owned a notable percentage of the total shares of KISCO, the majority owners of DSM and KISCO were brothers, and the two companies shared common directors and officers.[3] *See Letter from DSM to Commerce*, Nov. 15, 2002 (Confidential Doc.), at 2. At that time, prior to the review period at issue here, the

---

[3] Information found in the confidential version of the administrative record has been redacted in this public version of the opinion. Numbers have been replaced with words to provide some guidance for the legal conclusions in this case.

Korea Fair Trade Commission[4] ("KFTC") considered DSM and KISCO as part of the same

chaebol, or family of companies – the Dongkuk Steel Group. *Id.*

Significant changes in the nature of corporate ownership occurred since Commerce's

original investigation in this case. In early 2000, Sang-Tae Chang died, leaving his ownership in

DSM to his two sons Sae-Joo Chang and Saw-Wook Chang. *See DSM's Feb. 3, 2003*

*Submission* (Confidential Doc.), at 44-45. By the end of 2000, DSM reduced its ownership in

KISCO to a minimal percentage of the outstanding shares. *DSM's Feb. 3, 2003 Submission*

(Confidential Doc.), at 44-45. During the review period, KISCO did not own any shares of DSM

directly; however, KISCO indirectly owned a minuscule percentage of the outstanding shares of

DSM through its minimal percentage ownership in one of the other companies. *DSM's Feb. 3,*

*2003 Submission* (Confidential Doc.), at 34. Furthermore, DSM and KISCO did not share

common directors or officers during the period of review – a change that also took place in 2000.

But DSM and KISCO did inherit several of each other's directors and officers: a director of DSM

during part of the review period had been a senior manager at KISCO 22 years ago. *See DSM's*

*Mar. 24, 2003 Submission* (Confidential Doc.), at 5. The vice president of DSM was the director

of the administrative department for one of KISCO's plants 22 years ago. *See id.* The president

of DSM, was a non-standing director of KISCO 18 years ago. A director of DSM was a senior

manager of KISCO 23 years ago. Also, the current president and vice president of KISCO were

formerly managers at DSM. *Id.* at 6. The Chairman of KISCO left his position as the president

---

[4]The Korea Fair Trade Commission is a Korean governmental organization that formulates and administers competition policies and resolves antitrust cases, functioning as a quasi-judiciary body. *See About KFTC, Korea Fair Trade Commission, at* www.ftc.go.kr/eng/.

of DSM in 1998, fewer than five years ago. *See id.*

The administrative record indicates that during the review period, neither DSM nor any other Dongkuk Group company provided KISCO, its affiliates, or DKI, with loans or other financing assistance. *DSM's Feb. 3, 2003 Submission* (Confidential Doc.), at 46. Likewise, neither KISCO nor its affiliates provided DSM or any other Dongkuk Group company with financing assistance. Meanwhile, several commercial activities continued between DSM and KISCO, albeit at a lower level than prior to the review period. *See Letter from DSM to Commerce*, Nov. 15, 2002 (Confidential Doc.), at 3. Thus, during the 18-month review period, DSM sold a moderate number of tons of rebar to KISCO, and KISCO sold only a moderate number of tons of rebar to DSM. *See Letter from DSM to Commerce*, Nov. 15, 2002 (Confidential Version), at 3 (In comparison, during the investigation period, DSM sold a significant number of metric tons to KISCO, and KISCO sold a significant number of metric tons of rebar to DSM. *Id.*).

In its affiliation analysis, Commerce focused on the Chang family's stock ownership and control over DSM, KISCO and DKI. The two brothers, Sae-Joo Chang and Sae-Wook Chang, together owned a notable percentage of the shares of DSM[5]; their uncle, Sang Don Chang owned a significant percentage of KISCO[6], and Sang-Kuhn Chang owned a notable percentage of the

---

[5]Both Sae Joo Chang and Sae Wook Chang owned certain percentages.

[6]The members of Sang Don Chang's immediate family (i.e., his wife and children) owned additional percentages. *See List of Shares of DSM, DKC, KISCO and DKI Owned by Chang Family,* App. SA-15; *Chang Family Tree*, App. SA-18.

total shares of DKI.[7]  Based on this data, Commerce concluded "the Chang Family owns the largest blocks of outstanding shares in DSM, KISCO and DKI." *Issues and Decision Mem.*, Apr. 5, 2004, at 7.  In addition, Commerce considered the Chang Family's leadership positions in the three companies, which were as follows: Sae Joo Chang was the Chairman and Chief Economic Officer of DSM, Sae Wook Chang was a Director of DSM, Sang Don Chang was a Chairman of KISCO, and Sang Kuhn Chang was the Chairman of DKI.

Commerce observed that although there was no direct evidence that Sae Joo Chang and Saw Wook Chang acted in concert with their uncles, Sang Don Chang and Sang Kuhn Chang, there was a potential for their acting in concert or out of common interests.  It found that "while no single individual is in a position to restrain or direct the activities of DSM, KISCO and DKI, . . . the Chang family [was] 'a person' for purposes of section 771(33)(F) of the Act." *Issues and Decision Mem.* at 7.  Furthermore, "[b]ecause this family grouping has the potential to control DSM, KISCO and DKI, and its actions may potentially impact decisions concerning pricing of the subject merchandise, [Commerce] determined that DSM, KISCO and DKI are affiliated." *Id.* at 7-8.

The parties do not contest Commerce's determination that DSM and KISCO "have production facilities for similar or identical products" as required by the collapsing regulation. *See* 19 C.F.R. § 351.401(f) (2004).  The parties instead contest the third prong of the collapsing regulation requiring "a significant potential for the manipulation of price or production" between

---

[7]Sang-Kuhn Chang's immediate family members owned additional percentages of DKI. *See List of Shares of DSM, DKC, KISCO and DKI Owned by Chang Family,* App. SA-15; *Chang Family Tree*, App. SA-18.

the two companies. *See id.* Commerce considered common ownership as one of the factors in determining whether the potential for the manipulation of price or production was present, noting that in addition to the corporate ownership between DSM and KISCO, the Chang family owns a substantial percentage of DMS's and KISCO's outstanding shares. *See Collapsing Mem.,* Sept. 12, 2003, at 5. Commerce also determined that the Chang family occupied significant positions on the board of directors and in senior management at DSM and KISCO. Commerce observed that "[o]ver the years, there have . . . been several prominent transfers by Chang family members and other senior managers between the two companies." *Collapsing Mem.* at 5. Commerce concluded that having "several senior management positions (president, chairman and vice president) of both KISCO and DSM . . . held by employees that formerly worked for the other company, compounded by the family relationships between the Chairman of KISCO and the Chairman and a Director of DSM" contributed to the significant potential for the manipulation of price or production between KISCO and DSM. *Collapsing Mem.* at 6.

Commerce also determined that the operations of DSM and KISCO were intertwined, focusing on five major relationships between the two companies: 1) their sale of rebar to each other and sharing of customer information in connection with those sales; 2) DSM's and KISCO's ownership of Dongkuk International ("DKA")[8]; 3) DSM's and KISCO's affiliation with DKI through the Chang family ownership interest in the three companies and DSM's and KISCO's commercial interaction with DKI; 4) DSM's and KISCO's ownership interest in Chunyang Transportation Co., Ltd. ("Chunyang") and the value of the transportation services

_____

[8] DSM owned a very large percentage of DKA and KISCO owned a minuscule percentage. *Collapsing Mem.* at 6.

both companies received from Chunyang during the review period; and 5) DSM's and KISCO's ownership interest in Kukje Transportation Co., even though its freight transportation services were not purchased by either DSM or KISCO during the review period. *Collapsing Mem.* at 6-8. Plaintiff does not contest that those relationships exist, but argues that they provide no support whatsoever for Commerce's determination that there was a significant potential for manipulation.

As a result of collapsing, DSM's sales of rebar in the United States were compared to a blended normal value based on sales in Korea by both DSM and KISCO, resulting in a dumping margin of 11.74 % of DSM's sales. *See Final Results*, 69 Fed. Reg. at 19400.

## II. JURISDICTION AND STANDARD OF REVIEW

The court exercises its jurisdiction over this case pursuant to 28 U.S.C. § 1581(c) (2004). The court "must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966)). When the court applies this standard, it affirms the agency's factual

determinations "so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions." *Olympia Indus., Inc. v. United States*, 22 CIT 387, 389, 7 F. Supp. 2d 997, 1000 (1998) (citing *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984)); *see Granges Metallverken AB v. United States*, 13 CIT 471, 474, 716 F. Supp. 17, 21 (1989) (The court may not reweigh the evidence or substitute its own judgment for that of the agency.).

In determining whether Commerce's interpretation of the statute is in accordance with law, the court applies the two-step test set forth in *Chevron U.S.A., Inc. v. Natural Res. Def. Council. Inc.,* 467 U.S. 837, 842-43 (1984). First, the court evaluates as a matter of law "whether Congress's purpose and intent on the question at issue is judicially ascertainable," using "traditional tools of statutory construction." *Timex V.I., Inc. v. United States*, 157 F. 3d 879, 881 (Fed. Cir. 1998). If the statute's plain language addresses the issue, "that is the end of the matter." *Id.* If the statute's language is silent or ambiguous with respect to that issue, the court evaluates the reasonableness of Commerce's interpretation of the statute. *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994). Commerce's reasonable interpretation of the statute is accorded deference, even if the court finds another permissible interpretation. *Id.* "Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws." *Id.* (internal citation omitted).

### III. Discussion

#### A. <u>Commerce's Affiliation Determination</u>

As amended by the Uruguay Round Agreements Act,[9] the antidumping statute in pertinent part defines "affiliated persons" as follows:

> (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
> . . . .
> (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person. (G) Any person who controls any other person and such other person.
> For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

19 U.S.C. § 1677(33) (2004). The Statement of Administrative Action to the URAA explained that the antidumping statute was amended to account for the realities of the marketplace.[10] Statement of Admin. Action, H.R. Rep. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 4174 ("SAA") (the "traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm 'operationally in a position to exercise restraint or direction' over another even in the absence of an equity relationship.").

---

[9]Pub. L. 103-465, § 222 (1994).

[10]Congress expressly approved of this Statement in 19 U.S.C. § 3511(a).
The statement of administrative action approved by the Congress under section 3511(a) of this title shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.

19 U.S.C. 3512(d).

As a result, today Commerce can analyze relationships between potentially affiliated companies by considering whether "[a] company may be in a position to exercise restraint or direction . . . through corporate or family groupings." 1994 U.S.C.C.A.N. at 4174-75. Furthermore, Commerce has chosen not to further define "affiliated persons" or "control" by regulation, finding that it is "more appropriate to develop [its] practice regarding affiliation through the adjudication of actual cases." *Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27,296, 27,297 (Dep't Commerce, May 19, 1997); *see also* 19 C.F.R. § 351.102(b) (2004)[11] (adopting the statutory definition of "affiliated persons" without elaboration).

Considering this regulatory framework, the Court has previously upheld Commerce's interpretation that the definition of family includes uncle-nephew relationships under section 1677(33)(A). *Ferro Union Inc. v. United States*, 23 C.I.T. 178, 44 F. Supp. 2d 1310, 1325-26 (1999). Finding that the statute was not clear on its face as to the meaning of "family," the Court considered whether Commerce's construction of "family" to include uncles and nephews was a permissible interpretation of the statute under *Chevron.*[12] *Id.* at 1324; *see Chevron*, 467 U.S.

---

[11] The regulation provides certain factors for Commerce to consider:

> [T]he Secretary will consider the following factors, among others: corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships. The Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product. The Secretary will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control.

19 C.F.R. § 351.102(b).

[12] The Court in *Ferro Union* remanded the case, finding that Commerce failed to place one of the companies on notice that it would construe family to encompass more relationships

837.  In the same opinion, the Court upheld Commerce's interpretation of "any person" in section

1677(33)(F) to encompass "family."  *See Ferro Union*, 44 F. Supp. 2d at 1326 ("[T]he intent of

19 U.S.C. § 1677(33) was to identify control exercised through 'corporate or family groupings.' .

. . By interpreting 'family' as a control person, Commerce was giving effect to this intent.")[13]; *see*

*also Mitsubishi Heavy Industries, Ltd. v. United States*, 23 C.I.T. 326, 54 F. Supp. 2d 1183, 1190

(1999) (citing *Torrington Co. v. United States*, 68 F. 3d 1347, 1351 (Fed. Cir. 1995)

("Commerce is to be accorded substantial deference in interpreting the antidumping laws.")

Plaintiff argues that DSM and KISCO may not be considered affiliated for purposes of

collapsing because they "are not members of a family" under section 1677(33)(A).  *Pl. Br.* at 12.

Plaintiff also challenges the inclusion of nephews and uncles as part of a family definition under

section 1677(33)(A).  Alternatively, Plaintiff asserts that "[w]hatever affiliation may exist

between the nephews and uncles does not create a direct relationship between the companies they

control."  *Pl. Br.* at 16.  In the *Issues and Decision Memorandum,* Commerce did not address this

last point, instead focusing its final analysis of the affiliation between DSM and KISCO through

the definition in section 1677(33)(F).  Nor did the government address this issue in its brief,

merely reiterating that because the nephews and uncles of the Chang family are members of the

same family, the companies are affiliated pursuant to section 1677(33)(A).

In challenging Commerce's analysis of affiliation under section 1677(33)(F), Plaintiff

---

than those listed in the statute.  *See Ferro Union*, 44 F. Supp. 2d at 1326.

[13] It should be noted that Commerce's regulations define "person" as "any interested party, as well as any other individual, enterprise, or entity, as appropriate."  19 C.F.R. § 351.102(b) (2004).  For further discussion on the reasonableness of Commerce's statutory interpretation see *Ferro Union*, 44 F. Supp. 2d at 1325-27.

contends that DSM and KISCO are not affiliated because the Chang family grouping that the Department found to control the companies does not constitute a person. According to Plaintiff, the statutory term "any person" in section 1677(33)(F) is meant to refer to a single person. *Pl. Br.* at 16. Referencing section 1677(33)(A), which defines members of a family as affiliated persons, Plaintiff argues that "members of a family" do not lose their separate existence by virtue of being considered "affiliates." In other words, because they are defined as "affiliates" in one subsection (A), they cannot then be viewed as one person for purposes of subsection (F). *See Pl. Br.* at 17. Interpreting the singular term "any person" in section 1677(33)(F) to encompass plural "persons," Plaintiff argues, renders the statutory provisions meaningless.

Commerce maintains that although section 1677(33)(F) uses a singular phrase "any person," the Court has already recognized that it can be interpreted to encompass a "family" in order to carry out the intent of the antidumping statute. *See Ferro Union*, 44 F. Supp. 2d. at 1326. The court finds that *Ferro Union*'s conclusion that Commerce's interpretation of section 1677(F) was reasonable under *Chevron* should not be disturbed because it complies with the statutory framework. *Id.*; *see also* 19 C.F.R. § 351.102(b) ("In determining whether control over another person exists, within the meaning of section [1677(33)]. . ., the Secretary will consider the following factors, among others: corporate or family groupings.").

Commerce's determination that DSM, KISCO and DKI were affiliated under section 1677(F) is also supported by substantial evidence. Commerce explained that "the Chang family's leadership positions, namely Saw Joo Chang's position as the Chairman and the CEO of DSM, Sae Wook Chang's position as a Director of DSM, and Sang Kuhn Chang's position as the

Chairman of DKI," combined with "the fact that the Chang family owns the largest blocks of outstanding shares in those three companies, places the Chang family in a position to legally and/or operationally restrain or direct DSM, KISCO and DKI." *Issues and Decision Mem.* at 7; *see* 19 U.S.C. § 1677(33) ( "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."). Furthermore, Commerce did not have to find that the affiliated companies acted in concert, but rather that the Chang family has the potential to control DSM, KISCO and DKI, impacting decisions concerning pricing of the subject merchandise. *See Ferro Union*, 44 F. Supp 2d at 1326 (holding that once it determined that certain family members controlled company Saha Thai and Company A, Commerce logically determined that these companies were affiliated pursuant to 19 U.S.C. § 1677(33)(F) because of the family's control). Because the court finds that Commerce's analysis of affiliation between DSM and KISCO pursuant to section 1677(33)(F) is supported by substantial evidence, the court does not need to review Commerce's affiliation analysis under section 1677(33)(A).

**B. Commerce's Decision to Collapse DSM and KISCO**

Commerce's collapsing regulation requires a three-prong analysis.[14] First, Commerce

---

[14] Collapsing involves treating two or more companies as a single entity for purposes of calculating a single weighted-average dumping margin for those companies. The collapsing regulation provides:

(f) Treatment of affiliated producers in antidumping proceedings.
(1) In general. In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.

must determine that the companies are affiliated.  19 C.F.R. § 351.401(f)(1); *see, e.g., Kaiyuan v. Group Corp. v. United States*, 28 CIT __, 343 F. Supp. 2d 1289, 1301 (2004) ("Commerce's initial affiliation determination is concerned with the parties [sic] potential to impact decisions concerning price or production. . . . ").  Then, Commerce determines whether the producers share "production facilities for similar or identical products."  19 C.F.R. § 351.401(f)(1).  Finally, Commerce has to find "a significant potential for the manipulation of price or production" between the affiliated companies in order to collapse.  19 C.F.R. § 351.401(f)(1).  According to its regulation,

> [i]n identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:
> (i) The level of common ownership;
> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
> (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f)(2).   In examining these factors, Commerce considers both actual manipulation in the past and the possibility of future manipulation, which does not require evidence of actual manipulation during the period of review.  *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. at 27,346 ("[A] standard based on the potential for manipulation focuses on what may transpire in the future.")

In this case, Plaintiff does not dispute Commerce's finding that DSM and KISCO share "production facilities for similar or identical products."  Plaintiff contends that Commerce's

_____

19 C.F.R. § 351.401(f)(1).

finding of a significant potential for the manipulation of price or production was not supported by

substantial evidence, arguing that Commerce did not adduce sufficient evidence that the

members of the Chang family have the ability or incentive to coordinate their actions in order to

direct DSM and KISCO to act in concert with each other. Plaintiff argues that the tenuous

affiliation between the members of the extended Chang family cannot compensate for the

absence of any evidence of mechanisms through which management of DSM and KISCO might

have been shared. Commerce maintains that its determination that there was a significant

potential for the manipulation between DSM and KISCO was supported by the evidence of

significant common ownership and management overlap by the companies' senior managers,

who (a) have a significant influence over the production and sales decisions of both companies

due to their positions and ownership, (b) belong to the same family; and (c) are former managers

of the other company. Commerce supports its conclusion that the members of the Chang family

have the ability and incentive to coordinate their actions in order to direct DSM and KISCO to

act in concert with each other by citing to the fact that the Chang family is the largest shareholder

in DSM and KISCO and that the two nephews and their uncles hold senior leadership positions

in those companies.

Commerce's conclusion that the Chang family members have the ability and financial

incentive to coordinate their actions in order to direct DSM and KISCO to act in concert with

each other is further buttressed by other factors considered by Commerce. Commerce found that

there had been several prominent transfers of senior managers between the two companies. *See*

*Collapsing Mem.* at 5-6. While the transfers of the senior managers occurred between 5 and 23

years before the review period, Commerce explained that those transfers contributed to the weight of evidence, suggesting that the companies had a significant potential for manipulation. In addition, the Department observed that DSM and KISCO were involved in certain intertwining operations, including: 1) home market sales of rebar to each other and sharing of customer information in connection with those sales; 2) utilizing an affiliated transportation company, in which both had ownership interest; and 3) jointly owning shares in other companies, Kukje and DKA, and a common affiliation with DKI that resells certain DSM steel products to the United States and supplies KISCO with refractories and ferrite. *Issues and Decision Mem.* at 8, 11. While the record also suggests that the companies had significantly reduced their intertwined operations by the review period, Commerce did not have to consider the companies' alleged desire to disentangle their operations, because its inquiry concerns the potential for manipulation during the review period based on a non-exclusive list of factors.

The court finds that Commerce adduced sufficient evidence to anchor its determination that the activities of DSM and KISCO show a significant potential for the manipulation of price or production. While the individual factors considered by Commerce might not be sufficient to support Commerce's conclusion, the totality of evidence identified by Commerce demonstrates a significant potential for manipulation between DSM and KISCO.

#### CONCLUSION

Plaintiff's challenges to Commerce's decision to collapse DSM and KISCO are without merit. The court finds Commerce's interpretation of the antidumping statute reasonable, and

further concludes that Commerce's decision to collapse DSM and KISCO is supported by substantial evidence. Consequently, Plaintiff's motion for judgment upon the agency record is denied.

A separate order will be entered accordingly.


June 22, 2005                                        /s/ Judith M. Barzilay

Dated : _____          _____

New York, New York                              Judith M. Barzilay