(Slip Op. 95–88)

DUTY FREE INTERNATIONAL, INC., AMMEX WAREHOUSE CO., INC., AND AMMEX TAX & DUTY FREE SHOPS, INC., PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND GIT-N-GO, DEFENDANT-INTERVENOR

Court No. 91–07–00534

(Decided May 12, 1995)

*Tompkins & Davidson (Harvey A. Isaacs, Brian S. Goldstein,* and *Laurence M. Friedman)* for plaintiffs.

*Frank W. Hunger,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Susan Burnett Mansfield), Christopher Doherty,* United States Customs Service, of counsel, for defendant.

*Mudge Rose Guthrie Alexander & Ferdon (Richard H. Abbey, Richard G. King)* for defendant-intervenor.

## MEMORANDUM OPINION

DiCARLO, *Chief Judge:* Before the court is the remand determination of the United States Customs Service, issued pursuant to *Duty Free International, Inc. v. United States,* 17 CIT 1425 (1993) *(Duty Free I).* Duty Free International, Inc. (Duty Free), operators of a duty-free store near the Canadian border in New York State, seek revocation of Customs' approval of Git-N-Go's (GNG) application to establish a duty-free store in the same vicinity. Duty Free alleges that GNG's approved delivery procedures do not comply with the statutory and regulatory requirements for a bonded warehouse, and renews its motion pursuant to USCIT R. 56.1 for judgment upon an agency record. The court has jurisdiction pursuant to 28 U.S.C. § 1581(i) (1988).

## BACKGROUND

Duty Free operates a duty-free store on the East Service Road of Interstate Route 87 (I-87) in Champlain, New York. The store is immediately opposite Exit 43, the last exit and on-ramp off I-87 south of the Canadian border. A vehicle has no legal alternative but to proceed into Canada once it has entered the northbound on-ramp of I-87 from the East Service Road.

GNG's duty-free operation is an unspecified distance south of Duty Free's store on the East Service Road. Under GNG's approved delivery procedures, a bonded cartman, an employee of GNG, transports the purchased merchandise from the store to the purchaser. Delivery is then made at a point between Duty Free and GNG's stores, approximately 2/10 of a mile south of the entrance to I-87, and approximately 9/10 of a mile south of the Customs inspection building at the Port of Champlain. The cartman advises the purchaser that the merchandise is only for export into Canada, and then watches the purchaser's vehicle until it enters the northbound ramp of I-87.

Duty Free filed this action seeking to set aside Customs' approval of GNG's application to establish a duty-free bonded warehouse. Duty Free and the United States cross-moved for summary judgment. The court denied the parties' cross motions, and remanded the action to the Customs District Director to submit a more complete agency record and provide an explanation for the approval of GNG's application.

In particular, the court directed the District Director to seek internal advice from Customs Headquarters regarding: (1) whether a "practical alternative" to exiting the United States exists for a purchaser of duty-free merchandise at GNG's delivery location, where the purchaser has the ability not to depart the United States; and (2) whether a cartman's vehicle falls within the meaning of a "merchandise storage location,"

under 19 U.S.C. § 1555(b)(3)(F)(ii)(I) (1988). *Duty Free I,* 17 CIT at 1432–33.

Duty Free contends that GNG's delivery procedures fail to meet the statutory standard governing delivery of duty-free merchandise, as delivery does not take place "at or beyond the exit point." 19 U.S.C. § 1555(b)(3)(F)(ii)(I). Further, Duty Free contests Customs' finding that GNG delivers merchandise to its customers at a "merchandise storage location," *id.,* and provides "reasonable assurance" of exportation, 19 U.S.C. § 1555(b)(3)(A). According to Duty Free, Customs' actions therefore must be set aside as "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994).

## DISCUSSION

The court reviews an action under 19 U.S.C. § 1581(i) as provided in 5 U.S.C. § 706. Pursuant to section 706, the court shall hold unlawful and set aside Customs' decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971) (holding court must examine whether there was clear error of judgment).

Further, review of an agency decision on a motion for judgment upon an agency record mandates a careful inquiry into the facts of a case, but the search must be narrow and "plainly deferential to the determinations, findings and conclusions of the agency * * *. [T]his court is not permitted to itself weigh the evidence and substitute its judgment for that of the agency * * * ." *Jeannette Sheet Glass Corp. v. United States,* 11 CIT 10, 14, 654 F. Supp. 179, 182–83 (1987).

### 1. Applicable Statute and Regulation:

The statutory provision governing the establishment of duty-free stores, 19 U.S.C. § 1555(b), provides that duty-free merchandise shall be delivered "at or beyond the exit point," unless Customs approved the location before enactment of the Omnibus Trade Act of 1987.[1] 19 U.S.C. § 1555(b)(3)(F)(ii).

---

[1] Section 1555(b), title 19, United States Code, provides in pertinent part:

**(b) Duty-free sales enterprises**
\*   \*   \*   \*   \*   \*   \*

  (3) Each duty-free sales enterprise—
    (A) shall establish procedures to provide reasonable assurance that duty-free merchandise sold by the enterprise will be exported from the customs territory;
\*   \*   \*   \*   \*   \*   \*

    (F) shall deliver duty-free merchandise—
      (ii) in the case of a duty-free sales enterprise that is a border store—
        (I) at a merchandise storage location at or beyond the exit point; or
        (II) at any location approved by the Secretary before the date of enactment of the Omnibus Trade Act of 1987.
\*   \*   \*   \*   \*   \*   \*

  (8) For purposes of this subsection—
\*   \*   \*   \*   \*   \*   \*

    (F) The term "exit point" means the area in close proximity to an actual exit for departing from the customs territory * * *.

19 U.S.C. § 1555(b).

The statute defines "exit point" as "the area in close proximity to an actual exit for departing from the customs territory.". 19 U.S.C. § 1555(b)(8)(F). Customs implementing regulation further defines "exit point" as "the point at which a departing individual has *no practical alternative* to continuing on to a foreign country or to returning to Customs territory by passing through a U.S. Customs inspection facility." 19 C.F.R. § 19.35(d) (1994) (emphasis added).

## A. *"At or Beyond the Exit Point"*:

Duty Free contests Customs' finding that the location of GNG's store is "at or beyond the exit point." Duty Free, while conceding that "exit point" is imprecisely defined in the statute, asserts the statutory design and the common meaning of the term indicates an area "immediately near" an *actual exit* is required. (Pl.'s Br. for J. upon Agency R. at 21.) Duty Free contends a site nearly one mile from the actual border, and nearly a quarter mile from the interstate highway entrance, which permits opportunities to return to the United States, is not "immediately near."

Duty Free further argues that this court's prior opinion, *Duty Free I,* 17 CIT 1425, and Customs' own implementing regulation, 19 C.F.R. § 19.35(d), mandate a stricter standard for exit point. These provide that an exit point must be a location at which there is "no practical alternative" but to continue to a foreign country. 19 C.F.R. § 19.35(d); *see also Duty Free I,* 17 CIT at 1429 (requiring "feasible way to assure that the goods are exported.")

Duty Free points to methods by which GNG patrons may avoid exporting their purchases. A GNG customer may turn around on the service road instead of entering the highway; alternatively, GNG's customers can drive into the parking lot of Duty Free's store—located farther down the road—turn around and exit proceeding south, without departing the United States. Nothing prevents a GNG store patron from taking such action; GNG possesses no police power to mandate exportation. Finally, Duty Free contends that GNG has not implemented procedures providing "reasonable assurance" of exportation of duty-free merchandise from the Customs territory. *See* 19 U.S.C. § 1555(b)(3)(A).

Customs recognizes the existence of these alternatives to exportation. Customs contends "[e]ven though there are possible alternatives to vehicles proceeding to Canada * * * we are of the opinion that there is a *low probability* that the duty free merchandise sold by GNG would not be exported." HQ Reply to Internal Advice Req., HQ 225176, at 4 (Feb. 23, 1994).

Accordingly, the issue before the court is whether Customs' finding of a "low probability" that duty-free merchandise would not be exported from the Customs territory conforms with regulatory and statutory mandates. These provisions require that there be "no practical alternative" to exportation of such merchandise, 19 C.F.R. § 19.35(d), that

GNG's delivery location be at or beyond "the area in close proximity to an actual exit for departing from the Customs territory," 19 U.S.C. § 1555(b)(8)(F), and that the duty-free store implement procedures providing "reasonable assurance" of exportation. 19 U.S.C. § 1555(b)(3)(A).

Customs' interpretation of its regulation is permissible. Whether an alternative is "practical" depends upon how the term is defined. A "practical alternative" may be one that is available, as plaintiff contends, or one that is in practice or probable, as Customs suggests. *See* Webster's Third New International Dictionary 1780 (unabr. 1981 ed.) (defining "practical" as "[2]b: being such in practice, conduct, effect, or essential character: VIRTUAL" and alternatively as "3: available, usable or valuable in practice or action: capable of being turned to use or account: USEFUL"). Under the definition employed by Customs, the low probability of an alternative's occurrence would preclude the alternative from being labeled practical.

While Customs' definition of "practical" is not one the court would adopt in the first instance, the mandates of judicial deference to an agency's construction of a regulation bind the court. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43 (1984) (noting agency's construction of statute need only be permissible). As the Federal Circuit has noted, "[t]o survive judicial scrutiny, an agency's construction need not be the *only* reasonable interpretation or even the *most* reasonable interpretation." *Koyo Seiko Co. v. United States,* 12 Fed. Cir. (T) ___, ___, 36 F.3d 1565, 1570 (1994) (citation omitted). The court's deference to the agency reaches its highest point where, as here, the court reviews an agency's construction of its own administrative regulation. *Udall v. Tallman,* 380 U.S. 1, 16–17 (1964). The administrative interpretation is controlling "unless plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14 (1945).

Customs' interpretation of its regulation is also consistent with the dictates of the statute. The broad language of section 1555(b) merely requires that the delivery location of duty-free merchandise be within "close proximity to an actual exit," 19 U.S.C. § 1555(b)(8)(F), and that the duty-free enterprise implement procedures providing "reasonable assurance" that duty-free merchandise will be exported from the United States. 19 U.S.C. § 1955(b)(3)(A).

Customs' approval of a location approximately 9/10ths of a mile from the actual exit is not an arbitrary or capricious interpretation or application of the statutory requirement of "close proximity." Congress did not specify a maximum distance, and this court does not find that a distance of under a mile is an impermissible interpretation of that term.

Moreover, Customs' finding—based upon its review of GNG's delivery procedures and location—that there was a "low probability" that duty-free merchandise would not be exported from the United States, satisfied the statutory requirement that GNG's delivery procedures

provide "reasonable assurance" of exportation. As the term "reasonable assurance" does not equate with an absolute guarantee of exportation, Senate Comm. on Finance, Omnibus Trade Act of 1987, S. Rep. No. 71, 100th Cong., 1st Sess., pt. IV, at 231 (1987), Customs did not abuse its discretion.

The court, based upon Customs' premise that there is a "low probability" of repatriation of duty-free merchandise, upholds Customs' determination that GNG's duty-free merchandise delivery location is "at or beyond the exit point" and that the procedures employed provide "reasonable assurance" of exportation.

## B. *Customs' Finding of "Low Probability":*

Duty Free further challenges Customs' factual determination that there exists a "low probability" duty free merchandise would not be exported. Customs, in approving GNG's application, reasoned "consideration was given to the relatively short distance between [the] proposed delivery site and Exit 43, * * * that the delivery site was within view of Customs' office at the Port of Champlain, and that their delivery procedure would be comparable [to] a previously approved procedure for [Duty Free]." Internal Advice Req., Jan. 31, 1994, at 2.

Duty Free contends these considerations did not provide reasonable assurance that the duty-free merchandise sold at GNG's facility would be exported. Duty Free notes that GNG's delivery location is nearly one quarter mile from the on-ramp on a public access road. According to Duty Free, there is nothing preventing a purchaser of duty-free merchandise from passing the freeway entrance or entering Duty Free's parking lot, and turning around.

Duty Free also argues the fact that the delivery point is within view of the Customs' Port of Champlain facility is misleading, as GNG's delivery location is still nearly one mile from the Customs' port building. According to Duty Free, it is doubtful that someone with normal eyesight would be capable of observing transactions with specificity at that distance. In any case, Duty Free contends, there is no indication that Customs officials at the Port are even watching.

Finally, Duty Free challenges Customs' comparison of GNG's facility to its own duty-free enterprise. Duty Free contends any such comparison would be erroneous, as the two stores were approved for operation under different criteria.

Congress has not specified with certainty the exact relationship between an "actual exit" from a Customs territory and an "exit point." *See* 19 U.S.C. § 1555(b)(8)(F); *see also* S. Rep. No. 71 at 231 (noting exact procedures required to provide reasonable assurance of exportation depend on number of factors including location, and physical and geographical surroundings). "[E]xit point," rather, is loosely defined. Customs, as the administering agency, possesses the discretion to determine whether the distance between the point of delivery and entrance to the on-ramp permits feasible and utilized alternatives to exportation.

Duty Free has also failed to point to any significant differences between the regulatory standards in effect before the enactment of section 1555 and those imposed afterwards. The legislative history of the Omnibus Trade and Competitiveness Act of 1988 suggests such differences are negligible. *See* S. Rep. No. 71 at 233 (noting delivery methods at preexisting duty-free stores provided sufficient assurance of exportation). In fact, plaintiff claims standards imposed on stores before enactment of the statute may have been stricter. *(See* Pl.'s Mem. Supp. Summ. J. at 44) (citing directives prior to implementation of section 1555 defining "exit point" as point where failure of exportation is "practical impossibility").

It appears Congress had a different purpose in mind when enacting the Omnibus Trade and Competitiveness Act of 1988—to unify standards, not necessarily raise them. The Senate Report to the applicable provisions begins "this section would establish, for the first time, a comprehensive statutory framework for the regulation and operation of duty-free [stores]." S. Rep. No. 71 at 229. Consistent with the above language, and in light of the relative proximity and similarity of both facilities, Customs could properly compare the two duty-free enterprises in making its determination.

Customs compared GNG's application to Duty Free's facility and comparable location (the two facilities are less than 1/5th of a mile apart) and found GNG's existing delivery procedures and location provided reasonable assurance of exportation. *(See* Def.'s Mem. Opp'n Pl.'s Mtn. Summ. J., App., Mem. from Nat Aycox, Office of Cargo Enforcement and Facilitation, U.S. Customs Service, June 25, 1991, at 1) (noting delivery locations of the two duty-free facilities "are extremely close to each other and provide approximately the same degree of assurance that duty-free goods are exported").

Plaintiff's experience shows delivery near the entrance to I-87 virtually ensures exportation. Of a large number of sales made by Duty Free, very few instances were observed where duty-free merchandise was not exported from the United States. (Pl.'s Mem. Supp. Summ. J., Ex. F, Pl.'s Resps. to Def.'s First Interrogs., No. 5.) Indeed, duty-free merchandise was exported 99.989 percent of the time. *Id.*

Further, GNG's procedures reinforce exportation. GNG advises its customers on two separate occasions that the duty-free purchases are only for export to Canada: when the customer originally purchases the goods in GNG's facility, and when the cartman delivers the purchases. *(See* Pl.'s Mem. Supp. Summ. J., Ex. G, Letter from GNG to District Director of Customs, July 16, 1990.) Once delivery is made, the cartman observes the vehicle entering I-87. *Id.* It appears that the particular GNG employee delivering the merchandise to the vehicle is also responsible for monitoring the vehicle until it enters I-87, *id.,* thus the cartman knows which vehicles contain duty-free merchandise.

Although conditions may not always permit Customs to observe delivery and conduct spot checks, the court may not substitute its judgment

for that of the agency in determining whether "any pattern of diversion by purchasers from immediate exportation would be readily apparent to Customs Officers at the port and investigated." Internal Advice Req. at 3. Further, the court will not supplant the agency's findings, merely by identifying alternative conclusions, even though the evidence may support more than one interpretation. *See Arkansas v. Oklahoma,* 112 S. Ct. 1046, 1060 (1992).

The court finds the totality of factors—(1) the nature and location of the delivery point; (2) the short distance between the delivery point and the actual exit, permitting the cartman to monitor the vehicle until it enters the on-ramp; (3) the similarities with Duty Free's previously approved facility; and (4) GNG's delivery procedures—provide a reasonable basis for Customs' finding of a low probability that duty-free merchandise purchased from GNG would evade exportation.

### 2. *"Merchandise Storage Location":*

Besides delivery "at or beyond the exit point," 19 U.S.C. § 1555(b)(3)(F)(ii)(I), the statute further requires that a duty-free store deliver its merchandise "at a merchandise storage location." *Id.* Customs found that the cartman's vehicle used to transport duty-free merchandise to the delivery point was a "functional equivalent" of a mobile crib, and [fell] within the meaning of 'a merchandise storage location' as provided in the statute." HQ Reply at 6.

Duty Free challenges Customs' finding. According to Duty Free, a merchandise storage location, and similarly a crib, are facilities where merchandise is retained and stored for an extended period, rather than ones in which goods are merely transported and delivered. Duty Free further contends these facilities must be located beyond the exit point at delivery.

Duty Free does not contest that a crib may be a merchandise storage location. The regulations provide that a Class 9 warehouse with crib locations will be treated as a merchandise storage location. 19 C.F.R. § 19.35(c) (1994). Accordingly, a crib may also constitute such a location.

The court determines, therefore, whether GNG's delivery vehicle may be analogized to a "crib." Section 19.37(a), title 19, Code of Federal Regulations, defines "crib" as "a bonded area * * * for the retention of a small supply of articles for delivery to persons departing from the United States." 19 C.F.R. § 19.37(a) (1994). Further, a crib may be "a mobile facility * * * periodically moved * * * beyond the exit point." *Id.* GNG's cartman's vehicle falls into this definition, as it retains duty free merchandise for delivery. The regulations do not require retention of merchandise for an extended time, as Duty Free contends; temporary storage of merchandise during transfer to the duty-free purchaser is sufficient. The main inquiry in approving a merchandise storage location is the delivery location—whether it is at or beyond the exit point—rather than the delivery method. The court has already addressed and approved Customs' determination as to this issue.

Customs' interpretation of a cartman's vehicle as a merchandise storage location does not appear to frustrate the statutory purpose, nor is Customs' analogy of the cartman's vehicle to a crib unreasonable. Due to an agency's discretion in interpreting its own regulations, Customs' construction is permissible. *See generally Chevron,* 467 U.S. at 843.

CONCLUSION

Customs' approval of GNG's application to operate a duty-free store is upheld. The court finds Customs properly determined that there was no practical alternative to the exportation of duty-free merchandise from GNG's delivery location, and that Customs' finding of GNG's cartman's vehicle as a merchandise storage vehicle was proper. Plaintiff's motion for judgment on the agency record is denied. Action dismissed.