**AIMCOR, Alabama Silicon, Inc., American Alloys, Inc., Globe Metallurgical, Inc. and American Silicon Technologies, Plaintiffs/Cross–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee,**

v.

**COMPANHIA FERROLIGAS MINAS GERAIS–MINASLIGAS, Defendant–Appellant.**

**Nos. 96–1502, 97–1009.**

United States Court of Appeals, Federal Circuit.

April 9, 1998.

---

William D. Kramer, Baker & Botts, L.L.P., Washington, DC, argued, for plaintiffs-cross appellants. With him on the brief was Martin Schaefermeier. Of counsel was Clifford E. Stevens, Jr.

John K. Lapiana, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and A. David Lafer, Senior Trial Attorney. Of counsel on the brief was Dean A. Pinkert, Attorney Advisor, Office of Counsel, U.S. Department of Commerce, Washington, DC.

Philippe M. Bruno, Dorsey & Whitney LLP, Washington, DC, argued, for defendant-appellant. With him on the brief was Munford Page Hall, II. Of counsel were Karen A. Zughaib and John B. Rehm.

Before NEWMAN, PLAGER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

This antidumping action stems from the investigation of ferrosilicon[1] imported from Brazil. Plaintiffs/Cross–Appellants, AIM-COR, Alabama Silicon, Inc., American Alloys, Inc., Globe Metallurgical, Inc., and American Silicon Technologies (collectively "AIM-COR"), are United States ferrosilicon producers, manufacturers, or resellers. Defendant/Appellant, Companhia Ferroligas Minas Gerais–Minasligas ("Minasligas"), is a Brazilian producer and exporter of ferrosilicon. Minasligas appeals the decision of the United States Court of International Trade sustaining the determination of the International Trade Administration, United States Department of Commerce ("Commerce"), that Minasligas had sold ferrosilicon at less than fair value and imposing an antidumping order. See AIMCOR v. United States, No. 94–03–00182, 1996 WL 276955, at *2 (Ct. Int'l Trade May 21, 1996). Specifically, Minasligas challenges the inclusion of Brazilian value-added taxes as part of the cost of materials in determining constructed value pursuant to 19 U.S.C. § 1677b(e)(1)(A) (1988).[2] See AIM-COR, 1996 WL 276955, at *1. AIMCOR

---

1. "Ferrosilicon is a ferroalloy produced by combining silicon and iron through smelting in a submerged-arc furnace. [It] is used primarily as an alloying agent in the production of steel and cast iron. It is also used in the steel industry as a deoxidizer and a reducing agent, and by cast iron producers as an inoculant." Initiation of Antidumping Duty Investigations: Ferrosilicon From Brazil and Egypt, 58 Fed.Reg. 7529, 7530 (Feb. 8, 1993) (providing the specific chemical compositions of the ferrosilicon covered in the investigation).

2. The antidumping statutes were amended by the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994) ("URAA"). The URAA does not apply to investigations initiated before January 1, 1995. See URAA § 291(a)(2), (b); see also NSK Ltd. v. United States, 115 F.3d 965, 968 n. 3 (Fed.Cir.1997). Since the investigation in this case was initiated prior to January 1, 1995, the resolution of this appeal is governed by the antidumping laws in effect before enactment of the URAA. In the interest of convenience, we use the present tense when referring to those laws. All citations to the United States Code are to the 1988 edition, unless otherwise noted.

cross-appeals, challenging the interest rate used by Commerce to calculate Minasligas' imputed negative, United States credit expenses. We affirm.

## BACKGROUND

### I.

The antidumping laws protect United States industries against the sale of foreign manufactured goods in the United States at prices below the fair market value of those goods in the foreign country. The laws impose additional duties on imported merchandise that is being sold, or is likely to be sold, at less than its fair market value, when those sales materially injure, threaten to materially injure, or retard the establishment of a United States industry. *See* 19 U.S.C. § 1673. The quantum of the duties imposed, known as the "dumping margin," is the amount by which the foreign market value of the goods exceeds their United States price. *See* 19 U.S.C. § 1673; 19 C.F.R. § 353.2(f) (1997). These additional duties are designed to account for the dumping margin (i.e., raise the United States price to the foreign market value of the merchandise). *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1576 (Fed.Cir.1993).

▇ The United States price of the goods is either the "purchase price" or the "exporter's sales price." 19 U.S.C. § 1677a(a). The "purchase price" is the price at which a United States buyer purchases or agrees to purchase the merchandise prior to importation. 19 U.S.C. § 1677a(b). The "exporter's sales price" is the price at which the merchandise is sold or agreed to be sold prior to or after importation by or for the account of the exporter. 19 U.S.C. § 1677a(c). Foreign market value is determined using one of three methods: (1) home market sales; (2) third country sales; or (3) constructed value. *See* 19 U.S.C. § 1677b(a)(1), (2); *see also NSK*, 115 F.3d at 968. Home market sales is the preferred method for determining foreign market value. *See Smith–Corona Group v. United States*, 713 F.2d 1568, 1573, 1 Fed. Cir. (T) 130, 134 (Fed.Cir.1983). When information on home market sales is insufficient, either the third country sales

method or the constructed value method is used to determine foreign market value. *See Zenith Elecs.*, 988 F.2d at 1577.

In calculating foreign market value, Commerce disregards home market and third country sales of merchandise at less than the cost of production, if such sales have been made over an extended period of time in substantial quantities and the sales are at prices which do not permit recovery of all costs within a reasonable period of time in the normal course of trade. *See* 19 U.S.C. § 1677b(b). Whenever sales at less than the cost of production are disregarded and Commerce finds that the remaining sales are an inadequate basis for determining foreign market value, the constructed value method is used to determine foreign market value. *See id.; see also NSK*, 115 F.3d at 969. Constructed value is calculated by adding the cost of materials, general expenses, profit, and incidental expenses according to a statutory formula. *See* 19 U.S.C. § 1677b(e)(1). The statute provides in pertinent part as follows:

> [C]onstructed value ... shall [include] ... the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise under consideration which would ordinarily permit the production of that particular merchandise in the ordinary course of business.

19 U.S.C. § 1677b(e)(1)(A); *see also* 19 C.F.R. § 353.50(a) (1997).

Both United States price and foreign market value are subject to certain adjustments to assure that the quantum of antidumping duties is calculated in a fair manner. *See* 19 U.S.C. § 1677a(d), (e); 19 U.S.C. § 1677b(a)(1), (a)(4); *see also Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1568 (Fed.Cir. 1994). Thus, the statute provides that foreign market value may be adjusted for "differences in circumstances of sale." 19 U.S.C.

§ 1677b(a)(4)(B). These circumstances of sale adjustments may include the costs of advertising, packing, after-sale rebates, and warranty and after-sale service expenses. *See* 19 C.F.R. § 353.56(a)(1), (2) (1997); *Koyo Seiko,* 36 F.3d at 1568 (citing *Smith–Corona,* 713 F.2d at 1573 n. 12, 1 Fed. Cir. (T) at 134 n. 12).

## II.

Turning to the case at hand, on January 12, 1993, AIMCOR;[3] Silicon Metaltech Inc.; United Autoworkers of America Local 523; United Steelworkers of America Locals 12646, 2528, 5171, and 3081; and Oil, Chemical & Atomic Workers Local 389 (collectively "petitioners") petitioned Commerce, alleging that ferrosilicon from Brazil was being sold or was likely to be sold in the United States at less than fair value. *Initiation of Antidumping Duty Investigations: Ferrosilicon From Brazil and Egypt,* 58 Fed.Reg. at 7529. The petitions were filed on behalf of the United States industry and the employees producing, manufacturing, and reselling material like the product at issue. *Id.* at 7529–30. The period of inquiry was from July 1 through December 31, 1992. *Id.* On August 16, 1993, Commerce issued its preliminary determination, finding dumping and suspending liquidation of ferrosilicon from Brazil. *Preliminary Determination of Sales at Less Than Fair Value: Ferrosilicon From Brazil,* 58 Fed.Reg. 43,323, 43,327 (Aug. 16, 1993) ("*Preliminary Determination* ").[4] On January 6, 1994, Commerce is-

sued its final determination, finding that Minasligas had not sold ferrosilicon at less than fair value. *Final Determination of Sales at Less Than Fair Value: Ferrosilicon From Brazil,* 59 Fed.Reg. 732, 739–40 (Jan. 6, 1994) ("*Final Determination* ").[5]

In making its Final Determination, Commerce based Minasligas' United States price on purchase price because its ferrosilicon was sold to unrelated purchasers in the United States prior to importation and other circumstances did not indicate the exporter's sales price. *Id.* at 733. As far as foreign market value was concerned, since petitioners had alleged that CBCC's and Minasligas' home market sales were made at less than the cost of production ("COP") and that foreign market value should be based on constructed value, Commerce initiated COP investigations of CBCC and Minasligas prior to making its Final Determination. *Id.* In a COP investigation, Commerce compares the cost of production[6] of the goods at issue to home market sales. *See Antidumping Manual,* ch. 8, at 60. As noted above, if Commerce determines that a sufficient quantity of home market sales were made at prices below the cost of production, Commerce bases foreign market value on constructed value.[7] In making its Final Determination, Commerce determined that CBCC's and Minasligas' home market sales were viable bases for calculating foreign market value. In its Final Determination, it therefore did not base foreign market value upon constructed value.[8] *Final Determination,* 59 Fed.Reg. at 733.

**3.** American Silicon Technologies, one of the plaintiffs/cross-appellants, was not one of the original petitioners.

**4.** The Preliminary Determination applied specifically to Italmagnesio S.A. Industria e Comercio, Minasligas, and Cia Brasileira Carbureto de Calcio ("CBCC") because those parties responded to Commerce's requests for information and were deemed substantially cooperative. It applied generally to all other Brazilian ferrosilicon exporters. *Preliminary Determination,* 58 Fed.Reg. at 43,326–27. While Commerce's determinations concerning Minasligas are the only determinations on appeal, as will be seen below, Commerce's position concerning CBCC is also relevant to the case. Commerce's findings concerning the other parties are not germane to the appeal.

**5.** Commerce did determine that CBCC had sold ferrosilicon at less than fair value. *Final Determination,* 59 Fed.Reg. 732, 740.

**6.** Cost of production consists of the cost of materials and fabrication; selling, general, and administrative expenses; and inventory carrying costs. *See* International Trade Administration, U.S. Department of Commerce, *Antidumping Manual,* ch. 8, at 58–59 (1993) ("*Antidumping Manual* ").

**7.** Generally, if more than ninety percent of domestic sales were made at prices below the cost of production, Commerce will use constructed value as the basis for determining foreign market value. *See Antidumping Manual,* ch. 8, at 60.

**8.** Commerce used the constructed value method to set foreign market value for one of CBCC's

In conducting the COP investigations of CBCC and Minasligas and in arriving at its Final Determination that home market sales were viable bases for calculating foreign market value, Commerce determined that Brazil's economy was hyperinflationary during the period of inquiry.[9] *Id.* Consequently, Commerce calculated monthly values for foreign market value, cost of production, and constructed value to eliminate the distortive effects of inflation. *Id.* In the COP investigations, Commerce included Brazilian value-added taxes as a cost of materials in the cost of production, for purposes of determining whether home market sales were made at prices above the cost of production. Commerce also included these taxes in calculating constructed value. *Id.* at 737. This decision to include the value-added taxes for purposes of the COP investigations was relevant to CBCC and Minasligas to the extent that it determined whether Commerce would base foreign market value on home market sales or constructed value.

However, in determining whether value-added taxes should be included in determining constructed value, if this method eventually was used to determine foreign market value, Commerce stated:

> [W]hen using [constructed value] as a surrogate for home market prices we must determine if in fact the entity under investigation is able to recover all of the taxes paid on inputs (raw materials) from its domestic sales of subject merchandise. If domestic sales of subject merchandise fully recover all of the domestic taxes paid on inputs, then these taxes would appropriately be excluded from the margin analysis. However, if the producer is not able to recover all input taxes from its sales of subject merchandise, then these actual costs must be reflected in the [constructed value].

*Final Determination,* 59 Fed.Reg. at 737 (citing *Camargo Correa Metais, S.A. v. United States,* 17 Ct. Int'l Trade 897, 911 (1993)).

This meant that value-added taxes would only be included in constructed value if the taxes paid on input materials were not fully recovered through the taxes collected on domestic sales. Since Commerce concluded in the Final Determination that Minasligas' home market sales were made at prices above the cost of production, the decision to include value-added taxes as a cost of materials in the COP investigations did not directly affect Minasligas. Since the foreign market value of Minasligas' goods was being based on home market sales, and not constructed value, the possibility of including the taxes in constructed value did not affect Minasligas. The possibility of including these taxes in determining constructed value was directly pertinent to CBCC, though, because Commerce was basing a portion of its foreign market value on constructed value. However, Commerce excluded the value-added taxes paid by CBCC on input materials from the cost of materials, and therefore constructed value, the reason being that these taxes were fully offset by taxes collected by CBCC on domestic sales of the subject merchandise. *Id.* at 737.

In determining foreign market value for Minasligas, Commerce made circumstances of sale adjustments for differences in Minasligas' credit expenses pursuant to 19 U.S.C. § 1677b(a)(4)(B) and 19 C.F.R. 353.56(a) (1997). *Id.* at 735. Commerce made such adjustments for finance charges, warehousing, and quality control expenses. *Id.* Commerce also imputed negative credit expenses to offset the interest revenue Minasligas could earn on advance payments received by Minasligas prior to shipping export orders, as more fully explained below. *Final Determination,* 59 Fed.Reg. at 735.

In response to comments alleging errors in connection with the Final Determination, Commerce issued an amended final determination on February 23, 1994. *Notice of Amended Final Determination of Sales at*

---

sales because the data was insufficient to base foreign market value on home market sales in this instance. *Final Determination,* 59 Fed.Reg. at 734.

**9.** Commerce generally defines a hyperinflationary economy as one in which the annual inflation rate exceeds fifty percent, causing the value of the relevant currency to rapidly decline in relatively short periods of time. *See Antidumping Manual,* ch. 8, at 61, 63–64.

*Less Than Fair Value: Ferrosilicon From Brazil,* 59 Fed.Reg. 8598 (Feb. 23, 1994) (*"Amended Final Determination"*). Commerce determined that it had erred in its COP investigations and revised its analysis, using constructed value as the measure of foreign market value for CBCC's and Minasligas' ferrosilicon. *Id.* At this time, Commerce's previous decision to include value-added taxes paid on input materials as a cost of materials in determining constructed value, if not fully offset by taxes collected on domestic sales, became directly applicable to Minasligas because the foreign market value of its ferrosilicon was now being calculated using constructed value, rather than home market sales. However, as with CBCC, Commerce determined that Minasligas had fully recovered the value-added taxes paid on input materials through taxes collected on domestic sales. *AIMCOR v. United States,* No. 94–03–00182, 1995 WL 431186, at \*8 (Ct. Int'l Trade July 20, 1995). Therefore, Commerce did not include these value-added taxes in the cost of materials in calculating constructed value. *Id.* Correcting its errors, Commerce determined that Minasligas had sold ferrosilicon at less than fair value. *Amended Final Determination,* 59 Fed.Reg. at 8599.

Two Brazilian value-added taxes are at issue in this appeal: (1) the *imposto sobre produtos industrializados* ("IPI"), and (2) the *imposto sobre circulacao de mercadorias e servicos* ("ICMS"). The IPI is a value-added *ad valorem* excise tax, levied at varying rates on manufactured products. The ICMS is a value-added sales and service tax levied on sales or the physical movement of goods, freight, transportation and communications services, and electric energy. Most products exported from Brazil are exempt from both taxes. For each tax, a manufacturer offsets taxes paid by it on monthly purchases of raw materials or component parts against taxes collected by it from domestic sales of manufactured products.

Minasligas documents taxes paid on raw materials used in its production process and taxes collected from its sales of finished products in separate accounting ledgers. These ledgers are balanced each month to determine the amount of tax owed to the Brazilian government. If taxes collected from domestic sales exceed the taxes paid on raw materials, Minasligas forwards the excess to the Brazilian government. If taxes paid on raw materials exceed the taxes collected from domestic sales, Minasligas carries a tax credit forward to the following month and makes no payment to the Brazilian government.

In making its determination that Minasligas had made sales at less than fair value, Commerce nevertheless rejected the petitioners' claims that it had erroneously imputed negative credit expenses to Minasligas and had incorrectly used a cruzeiro-denominated [10] interest rate to calculate those credits. *Id.* at 8598. The petitioners had sought to eliminate the imputed negative credit expenses, which had the effect of lowering foreign market value, and therefore, the dumping margin. The petitioners had also challenged the use of a cruzeiro-denominated interest rate in calculating imputed negative credit expenses, their underlying rationale being that an alternative interest rate would lower the negative credit expenses, thereby increasing foreign market value and the dumping margin.

Negative credit expenses are explained as follows: Minasligas financed United States sales of ferrosilicon through the use of United States advance exchange contracts ("AECs"). Under the AECs, which were between Minasligas and a bank, the bank would advance Minasligas a portion of the value of new export contracts, prior to actual execution of the contract. Commerce determined that Minasligas was earning "negative credit expenses" by receiving these advance payments before shipping the subject ferrosilicon.[11] Commerce's established practice is

---

**10.** The cruzeiro is a Brazilian currency unit.

**11.** A company effectively extends credit to purchasers when it ships merchandise prior to payment, i.e., "[d]uring this period, the seller incurs additional expenses through the process of bor-

rowing funds pending receipt of payment or through the fact that funds are tied up due to the existence of accounts receivable." *Antidumping Manual,* ch. 8, at 18. Commerce uses credit expenses to account for these extensions of cred-

to calculate credit expenses from the date of shipment to the date payment is received from the customer.[12] *AIMCOR v. United States,* 1995 WL 431186, at *5. Minasligas incurred negative credit expenses (or earned credit revenue) from the United States AECs because the advances were received prior to shipment of the ferrosilicon by Minasligas and prior to actual payment by the customer. This allowed Minasligas to use the money prior to shipment of the ferrosilicon or payment by the customer.[13] *Id.* Commerce determined that the date Minasligas received advanced funds was equivalent to receipt of payment from the customer. *Amended Final Determination,* 59 Fed.Reg. at 8598. Commerce computed the imputed negative credit expenses by multiplying the time between receipt of the AEC advances by Minasligas and the actual shipment of the ferrosilicon by Minasligas by a cruzeiro-denominated interest rate.

### III.

AIMCOR and Minasligas appealed to the Court of International Trade, pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II), challenging various aspects of the Final Determination and the Amended Final Determination and seeking judgment upon the agency record pursuant to Ct. Int'l Trade R. 56.2.[14] *AIMCOR,* 1995 WL 431186, at *1. AIMCOR asserted that Commerce had erred in excluding Brazilian value-added taxes from the cost of materials in determining constructed value because these taxes were not remitted or refunded upon exportation of the merchan-dise within the meaning of 19 U.S.C. § 1677b(e)(1)(A). *Id.* at *8. Minasligas conceded that the IPI and ICMS value-added taxes were not remitted or refunded upon exportation of the subject ferrosilicon. *Id.* Noting that the statute requires that constructed value include the cost of materials "at a time preceding the date of exportation of the merchandise," 19 U.S.C. § 1677b(e)(1)(A), the court held that Minasligas might be able to show that the value-added taxes paid on input materials did not in fact constitute a cost of materials because these taxes were fully offset by taxes collected on domestic sales prior to exportation of the subject merchandise. *AIMCOR,* 1995 WL 431186, at *8. The court remanded for Commerce to determine if Minasligas had fully recovered value-added taxes paid on inputs prior to exportation of the subject ferrosilicon. *Id.*

At the same time, the court upheld Commerce's COP analysis. *Id.* at *4. The court also upheld Commerce's analysis of negative credit expenses, resulting from the AECs, but remanded with instructions that Commerce apply a United States dollar-denominated interest rate to the amounts at issue, rather than a Brazilian cruzeiro-denominated interest rate.[15] *Id.* at *6.

Commerce issued its final remand determination on January 17, 1996, after comment from the parties. *Final Redetermination of Remand in Ferrosilicon from Brazil,* at 1 (*"Final Remand Determination"*). In the Final Remand Determination, Commerce in-

---

12. Commerce adds these credit expenses to constructed value, thus leading to a higher foreign market value that accounts for the cost of extending credit to purchasers and carrying accounts receivable. This higher foreign market value increases the possibility of a dumping determination and the size of any dumping margin.

it. Since Minasligas received payment prior to shipment, in computing foreign market value, Commerce imputed a negative credit expense, as part of a circumstances of sale adjustment, to account for the interest Minasligas could earn on this money between receiving the advance and the actual shipment of the ferrosilicon. *See id.* at 19. As the Court of International Trade explained, "payment received prior to shipment provides an additional transactional benefit to the seller." *AIMCOR,* 1995 WL 431186, at *6.

13. When Commerce adds imputed negative credit expenses to constructed value, a lower foreign market value results, thus reducing the possibility of a dumping determination and the size of any dumping margin.

14. While the parties raised several challenges to Commerce's determination before the Court of International Trade, we address only those claims pertinent to the resolution of this appeal.

15. Commerce did not object to AIMCOR's contention that the cruzeiro-denominated interest rate was improper or to a remand for application of a United States dollar-denominated interest rate. *AIMCOR,* 1995 WL 431186, at *6.

cluded value-added taxes, the IPI and ICMS, as a cost of production in calculating constructed value because Minasligas could not show that the taxes were fully recovered prior to exportation. *Id.* at 8. Commerce required a sale-specific correlation between taxes paid on input materials and taxes recovered on the products produced from those materials:

> During the remand proceeding, [Commerce] requested that Minasligas and CBCC provide, for each U.S. sale, the date and amount of the ICMS and IPI taxes paid on the material inputs used in the production of merchandise sold to the United States, and evidence that these specific taxes were completely recovered prior to exportation for each U.S. sale. However, because each U.S. sale was exported on a unique date, the only way to determine, on a sale-specific basis, whether the taxes paid on the inputs used to produce the merchandise were recovered prior to exportation is to track the specific taxes paid for each input and measure whether these taxes were fully recouped by domestic sales revenue. The parties failed to submit this data. Indeed, they said they were unable to provide this data. The only information they did provide was monthly totals of taxes paid and collected. It is not possible to determine from this data whether the taxes paid on inputs were fully recovered. Accordingly, we find insufficient evidence to conclude that these taxes were fully recovered.

*Id.*

In the Final Remand Determination, Commerce also announced that it was revising its general policy concerning Brazilian value-added taxes, stating that it should have included those taxes in its earlier determinations because the taxes were not remitted or refunded prior to exportation, as required by 19 U.S.C. § 1677b(e)(1)(A). *Id.* at 9. Under its revised policy, Commerce assumes that the taxes paid on input materials are recouped by being included in the price of the exported products. Commerce stated its intention to include Brazilian value-added taxes as a cost of materials in constructed value in future investigations unless these taxes are remitted or refunded upon exportation. *Final Remand Determination,* at 10.

In the Final Remand Determination, Commerce rejected the use of United States dollar-denominated interest rates from the AECs as evidence of the rate at which Minasligas could borrow money. *Id.* at 5. Commerce refused to use these interest rates in computing the negative credit expenses because Minasligas received the advances, pursuant to the AECs, in cruzeiros.[16] *Id.* Instead, Commerce used an aircraft lease[17] with an interest rate denominated in United States dollars to determine the interest rate for calculating the negative credit expenses because this was Minasligas' only evidence of United States dollar borrowings and it reflected the credit terms Minasligas would encounter when borrowing United States dollars. *Id.*

On May 21, 1996, the Court of International Trade ruled on the Final Remand Determination. In so doing, the court sustained Commerce's treatment of the value-added taxes. *AIMCOR,* 1996 WL 276955, at *1. The court held that Minasligas had failed to carry its burden of proving that its pre-exportation cost of materials did not include value-added taxes. *Id.* The court also held that Commerce's decision to use the aircraft lease as evidence of Minasligas' United States dollar-denominated interest rate for purposes of recalculating the negative credit expenses was rational and well within Commerce's discretion. *Id.* at *2. The court rejected AIMCOR's contention that the interest rate in the aircraft lease was not short-

---

16. Commerce normally uses United States interest rates for calculating imputed credit expenses when a respondent has actual United States dollar borrowings. *See Antidumping Manual,* ch. 8, at 20. Since Minasligas received cruzeiros pursuant to the AECs, Commerce determined that the AECs did not constitute United States dollar borrowings. *Final Remand Determination,* at 16.

17. While Commerce referred to an "aircraft lease" in its Final Remand Determination, the actual transaction referred to was the financing of an aircraft purchase. The interest rate in this "lease" was the interest rate associated with the loan to finance the aircraft purchase. For consistency, we refer to the financing agreement as the "aircraft lease."

term.[18] *Id.* Since AIMCOR failed to raise before Commerce the issue of whether the chosen interest rate was annual or monthly, the court refused to address this contention by AIMCOR. *AIMCOR,* 1996 WL 276955, at *2.

Minasligas appeals to us challenging the inclusion of value-added taxes as a cost of materials in calculating constructed value. AIMCOR cross appeals challenging Commerce's use of the aircraft lease to determine the United States dollar-denominated interest rate applicable to the negative credit expenses. We have jurisdiction pursuant to 28 U.S.C. § 1295(5).

## DISCUSSION

### I.

Before reaching the merits of this appeal, we must address a pair of preliminary matters. First, Minasligas asserts that the Court of International Trade's final opinion is insufficient to support the court's judgment. At the same time, AIMCOR and the United States argue that Minasligas does not present a justiciable case or controversy, but rather seeks an advisory opinion construing 19 U.S.C. § 1677b(e)(1)(A). We address these contentions in turn.

### A.

■ A final decision of the Court of International Trade in a contested civil action must be supported by "a statement of findings of fact and conclusions of law" or "an opinion stating the reasons and facts upon which the decision is based." 28 U.S.C. § 2645(a) (1994). Minasligas takes the position that the court's opinion after remand, *AIMCOR v. United States,* No. 94–03–00182, 1996 WL 276955 (Ct. Int'l Trade May 21, 1996), does not meet the requirements of the statute because it does not provide an adequate basis for appellate review, it does not address Commerce's position on value-added taxes, and it does not clearly delineate the interpretation of 19 U.S.C. § 1677b(e)(1)(A)

used in the case. We disagree. The final opinion of the Court of International Trade explicitly presents its reasons for affirming Commerce's Final Remand Determination concerning value-added taxes and the interest rate applied to the imputed negative credit expenses. *See id.* at *1–2. The opinion satisfies the standard set forth in 28 U.S.C. § 2645(a). In *Camargo Correa Metais, S.A. v. United States,* 52 F.3d 1040 (Fed.Cir.1995), this court vacated a decision of the Court of International Trade for failing to comply with 28 U.S.C. § 2645(a). In *Camargo,* the Court of International Trade simply affirmed Commerce's findings in all respects, without providing factual findings, conclusions of law, or a statement of its reasons for so doing. Unlike the decision under review in *Camargo,* the Court of International Trade's opinion in this case sets forth both the factual findings and conclusions of law upon which its decision was based. While the court's opinion is brief, it provides the factual and legal underpinnings necessary for this court to provide meaningful appellate review. When read in conjunction with the court's first opinion in this case, *AIMCOR v. United States,* No. 94–03–00182, 1995 WL 431186 (Ct. Int'l Trade July 20, 1995), the court's final opinion, *AIMCOR v. United States,* No. 94–03–00182, 1996 WL 276955 (Ct. Int'l Trade May 21, 1996), is more than sufficient to meet the statutory standard of 28 U.S.C. § 2645(a).

### B.

■ Turning to the preliminary issue raised by AIMCOR and the government, we do not believe that Minasligas is seeking an advisory opinion, but rather is requesting relief in a justiciable controversy. AIMCOR and the government claim that Minasligas is seeking an advisory opinion construing 19 U.S.C. § 1677b(e)(1)(A). They argue that because Minasligas was given the opportunity to show that value-added taxes were recovered prior to exportation and therefore not part of the cost of materials, there is no

---

18. A short-term borrowing rate is generally used as the interest rate for imputed credit expenses because this rate is most suited for the short-term extension of credit between a buyer and a

purchaser. *See Antidumping Manual,* ch. 8, at 20; *Final Determination of Sales at Less Than Fair Value: Oil Country Tubular Goods from Austria,* 60 Fed.Reg. 33,551, 33,555 (June 28, 1995).

need to determine whether the statute requires taxes to be remitted or refunded to be excluded from the cost of materials. We disagree.

The Constitution, in articles II and III, limits the judicial power of federal courts to cases and controversies. The Supreme Court has elucidated the meaning of these terms:

> A "controversy" in this sense must be one that is appropriate for judicial determination.... The controversy must be definite and concrete, touching the legal relations of the parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). Minasligas seeks a concrete resolution of its dispute concerning antidumping duties. It does not seek a hypothetical construction of 19 U.S.C. § 1677b(e)(1)(A), but rather review of whether this provision, dealing with the determination of constructed value, was correctly interpreted and applied to its merchandise. Since Minasligas seeks review of a remand determination that adversely affects it, a justiciable controversy is presented. *See Rose Bearings Ltd. v. United States*, 751 F.Supp. 1545, 14 Ct. Int'l Trade 801, 802 (1990) (a court can adjudicate matters where it can redress an injury suffered by a litigant) (citing *Freeport Minerals Co. v. United States*, 758 F.2d 629, 634, 3 Fed. Cir. (T) 114, 120 (Fed.Cir.1985) (party can seek review of a remand determination that adversely affects it)). We reject the arguments of AIMCOR and the government because Minasligas seeks to have the value-added taxes excluded from the cost of materials. To the extent this requires us to construe 19 U.S.C. § 1677b(e)(1)(A) such construction is not advisory, but rather necessary to the resolution of the issue presented by Minasligas. Having determined that the opinion of the Court of International Trade provides an adequate basis for review

and that we are presented with a justiciable controversy, we turn to the merits.

## II.

 We review a decision of the Court of International Trade affirming or reversing the final results of an administrative review *de novo*. *See Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed.Cir.1996). In so doing, we "apply anew" the Court of International Trade's statutorily-mandated standard of review. *See id.; NSK*, 115 F.3d at 972. We uphold Commerce's final results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933, 3 Fed. Cir. (T) 44, 51 (Fed.Cir.1984) (internal quotations and citations omitted). This court decides *de novo* the proper interpretation of the governing statutory provisions. *See Koyo Seiko*, 36 F.3d at 1570.

## III.

 Commerce included the IPI and ICMS value-added taxes, paid by Minasligas on input materials, as a cost of materials in calculating constructed value. *Final Remand Determination*, at 8. Minasligas argues that this was error because these taxes were fully recovered through taxes collected on domestic sales. AIMCOR and the government support Commerce's decision, claiming that the taxes were not remitted or refunded prior to exportation, as required by 19 U.S.C. § 1677b(e)(1)(A), and arguing alternatively that Minasligas failed to show that taxes paid on inputs were fully recovered prior to exportation.

 Under 19 U.S.C. § 1677b(e)(1)(A), in determining constructed value, "any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used" is excluded from the "cost of materials" component of con-

structed value. Words in a statute are deemed to have their ordinary meaning. *See NSK*, 115 F.3d at 974–75 (giving the term "sale" as used in an antidumping statute its ordinary meaning). "Refund" means "to give or put back ... to return (money) in restitution, repayment, or balancing of accounts," and "remit" means "to let go back, send back." *Webster's Third New International Dictionary* 1910, 1920 (1986). It is undisputed that the IPI and ICMS taxes are not remitted or refunded upon exportation within the meaning of the statute. *AIMCOR*, 1995 WL 431186, at *8. In other words, these taxes are not paid back to Minasligas upon exportation of the ferrosilicon produced from the raw materials on which Minasligas paid taxes. Instead, as discussed above, Minasligas maintains ledgers in which it records on a running basis taxes it pays and collects. Then, each month, it "settles up" with the Brazilian government.

Commerce's position in the Final Determination was that "if in fact the entity under investigation is able to recover all of the taxes paid on inputs (raw materials) from its domestic sales of subject merchandise ... then these taxes would appropriately be excluded from the margin analysis." *Final Determination*, 59 Fed.Reg. at 737. The Court of International Trade concurred, stating, "[A] respondent that has fully recovered value-added taxes upon input costs prior to exportation, has not in fact incurred the value-added tax as a 'cost of materials.'" *AIMCOR*, 1995 WL 431186, at *8.

Using this interpretation, Commerce gave Minasligas the opportunity, during the remand proceedings, to provide evidence that the taxes paid on inputs were recovered prior to exportation through taxes collected on domestic sales of the merchandise produced from those inputs. *Final Remand Determi-*

nation, at 8. This was consistent with *Camargo*, in which Commerce was to develop a method to account for the economic reality that taxes paid on inputs are not a cost of materials if fully recovered through taxes collected on domestic sales. *See Camargo*, 17 Ct. Int'l Trade at 911. In this case, Commerce sought from Minasligas a sale-specific correspondence between the taxes paid on input materials (raw materials) and the taxes collected on the sale of the product (ferrosilicon) produced from those inputs.[19] *Final Remand Determination*, at 8.

The only evidence Minasligas produced on remand consisted of monthly totals of value-added taxes collected and paid. *Id.* While Minasligas' evidence, two tax ledgers containing taxes paid and taxes collected, is regularly inspected by the Brazilian government and conforms to Brazil's generally accepted accounting principles, this evidence is insufficient to show that Minasligas fully recovered the value-added taxes prior to exportation. Minasligas admitted that it was unable to provide the type of sale-specific correspondence between taxes paid on inputs and taxes collected on domestic sales of the products produced from those inputs that Commerce sought. *Id.* Even the monthly totals of taxes paid on input materials and taxes collected on domestic sales of finished products did not show that the value-added taxes were fully recovered. We agree with the Court of International Trade that Minasligas failed to meet its burden of proving that value-added taxes were fully recovered and that its pre-exportation cost of materials did not include value-added taxes. *See AIMCOR*, 1996 WL 276955, at *1.

Minasligas argues that Commerce effectively denied it the opportunity to prove that the value-added taxes were fully recovered prior to exportation. In the Final Remand

---

**19.** Thus, Commerce gave Minasligas the chance to show that it was entitled to have the IPI and ICMS taxes excluded from the cost of materials when computing constructed value. In so doing, Commerce gave Minasligas the opportunity to qualify for the 19 U.S.C. § 1677b(e)(1)(A) exclusion even though the Brazilian system of keeping a running total of taxes paid and collected and then "settling up" monthly with the Brazilian government does not seems to meet the literal requirements of the statute in terms of refund and remittance. This approach did not prejudice Minasligas because it was given the chance to demonstrate that value-added taxes were not a cost of materials, despite the express statutory language. This approach also does not foreclose a future interpretation of the statute that requires taxes to be remitted or refunded upon exportation to be excluded from the cost of materials. We express no opinion on whether such an interpretation would survive judicial scrutiny.

Determination, Commerce announced that, in future investigations, it would include Brazilian value-added taxes as a cost of materials in calculating constructed value unless the taxes were "remitted or refunded upon exportation," as expressly stated in 19 U.S.C. § 1677b(e)(1)(A). *Final Remand Determination*, at 10. Minasligas argues that Commerce, in effect, applied this construction of the statute to it. It claims that because ferrosilicon is produced through a continuous process where raw materials are continuously loaded into electric furnaces to produce a liquid product it is not possible to provide the sale-specific correspondence Commerce sought. We reject this argument. Commerce gave Minasligas the opportunity to show that value-added taxes were fully recovered prior to exportation. Even in a continuous process, such as the production of ferrosilicon, we believe it is possible to maintain records that show to some degree that taxes paid on input materials are offset by taxes collected from the domestic sale of products produced from those materials.[20] Essentially, Minasligas is arguing that since generally accepted accounting principles in Brazil do not require these sale-specific records, it should not be faulted for not having the records. We cannot agree. The failure to track the taxes on input materials and the taxes recovered from the sale of the merchandise produced from those materials rests solely with Minasligas. Minasligas had a meaningful opportunity to present evidence, and the evidence it presented was insufficient.

We decline to address whether we would accept the interpretation of 19 U.S.C. § 1677b(e)(1)(A) announced by Commerce in its final remand determination. This interpretation was not applied to Minasligas in this case and is not properly before this

court. Any statement on this future methodology would constitute an advisory opinion, which we decline to provide. We simply hold that, in this case, the Court of International Trade correctly sustained Commerce's methodology and inclusion of the IPI and ICMS value-added taxes in the cost of materials in calculating constructed value.

## IV.

■ As discussed, Commerce imputed negative, United States credit expenses to Minasligas to account for its receiving payment, prior to shipment of the subject ferrosilicon, pursuant to the AECs. *AIMCOR*, 1995 WL 431186, at *6. These negative credit expenses account for the additional benefits the seller receives from obtaining payment prior to shipment. *Id.* In this case, the negative credit expenses were used to offset credit expenses in determining foreign market value.[21] *Id.* (citing *Antidumping Manual*, ch. 8, at 19). Commerce originally used a cruzeiro-denominated interest rate to calculate the negative credit expenses, but switched to a United States dollar-denominated rate in the Final Remand Determination, as instructed by the Court of International Trade. *Id.* at 17. Commerce rejected the interest rates stated in the AECs and based its calculations on the interest rate in an aircraft lease submitted by Minasligas. *Final Remand Determination*, at 5. In its cross-appeal, AIMCOR argues that Commerce incorrectly used this aircraft lease in determining Minasligas' imputed negative credit expenses. AIMCOR argues that the AECs principal amounts and interest rates were expressed in United States dollars and that the Court of International Trade erred in concluding that the AEC advances were not

---

**20.** There was no evidence in the record to suggest that it was not possible to monitor input materials and correlate the product ferrosilicon to the input materials. For example, a first-in first-out system would allow a producer to correlate the first inputs into a process to the first output materials. It would then be possible to determine if the taxes collected on domestic sales of the finished products fully offset the taxes paid on the raw material inputs used to produce the finished products prior to exportation, thus per-

mitting the exclusion of the taxes from the cost of materials.

**21.** Credit expenses are the costs associated with carrying accounts receivable on the books and the expenses related to extending credit to purchasers for the interim between shipment and payment. Commerce accounts for these credit expenses by making circumstances of sale adjustments to foreign market value. *See Antidumping Manual*, ch. 8, at 18; 19 C.F.R. § 353.56 (1997).

United States dollar borrowings because Minasligas converted them to cruzeiros.

Commerce's stated policy is to use an interest rate tied to the currency in which future payments are expected:

> [W]hen sales are made in, and future payments are expected in, a given currency, the measure of the company's extension of credit should be based on an interest rate tied to the currency in which its receivables are denominated. Only then does establishing a measure of imputed credit recognize both the time value of money and the effect of currency fluctuations on repatriating value.

*Final Determination of Sales at Less Than Fair Value: Oil Country Tubular Goods From Austria,* 60 Fed.Reg. at 33,555; *see also Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan,* 61 Fed.Reg. 38,139, 38,161 (July 23, 1996) ("the first priority is to match the denomination of the interest factor to the denomination of the receivables in question"); *Certain Cut–to–Length Carbon Steel Plate From Sweden; Final Results of Antidumping Duty Administrative Review,* 61 Fed. Reg. 15,772, 15,780 (Apr. 9, 1996) (Commerce matches the interest rate used for credit expenses to the currency in which receivables are denominated). Commerce requires evidence of actual United States dollar borrowings to support a proffered United States dollar-denominated interest rate. *See Antidumping Manual,* ch. 8, at 20. Commerce uses a short-term borrowing rate to calculate imputed credit expenses. *Id.*

Commerce refused to apply the AEC interest rates, which were expressed in United States dollars, in calculating negative credit expenses because Minasligas actually received the AEC advances in cruzeiros. *Final Remand Determination,* at 5. Consistent with its stated policy of using the interest rate in which receivables are denominated, Commerce sought a United States dollar-denominated interest rate to apply to the negative credit expenses because Minasligas' receivables were denominated in United States dollars, i.e., Minasligas' customers were to pay for the ferrosilicon in United States dollars. Given that Brazil's economy was hyperinflationary during this period, *Final Determination,* 59 Fed.Reg. at 733, and the cruzeiro was declining at a rate of 25 to 30 percent per month, Commerce did not err in rejecting the AEC interest rates which were tied to advances received in cruzeiros. Commerce's decision to reject the AEC interest rates because Minasligas was paid in cruzeiros and its receivables were denominated in United States dollars is supported by substantial evidence on the record.

■ The only other evidence of United States dollar-denominated borrowings that Minasligas submitted was an aircraft lease. *Final Remand Determination,* at 5. Commerce relied on this lease to determine the interest rate for the imputed negative credit expenses. Commerce did not err in using this rate because it was the only evidence of record of Minasligas' United States dollar borrowings. The Court of International Trade rejected AIMCOR's objection that the interest rate in the aircraft lease was not a short-term interest rate. *AIMCOR,* 1996 WL 276955, at *2 n. 3. Given that Commerce's first priority is to match the denomination of the interest rate to that of receivables, we uphold the court's decision sustaining Commerce's choice of interest rate. We reject AIMCOR's argument that the AECs were United States dollar borrowings, the reason being that Minasligas borrowed, and was paid in, cruzeiros.

■ Finally, before the Court of International Trade, AIMCOR raised the issue of whether Commerce had applied an annual or monthly interest rate. *Id.* at *2. The court refused to address this argument because AIMCOR had not raised the issue during the comment period on the Final Remand Determination. *Id.* A party is required to exhaust administrative remedies before seeking judicial action. *See* 28 U.S.C. § 2637(d) (1994). We agree with the Court of International Trade that AIMCOR was precluded from raising this issue *de novo* before the court when it failed to present the issue during the applicable comment period. *See Budd Co., Wheel & Brake Div. v. United States,* 773 F.Supp. 1549, 15 Ct. Int'l Trade 446, 453

(1991) (a party failing to raise an issue at the administrative level during remand proceedings cannot raise the issue *de novo* before a reviewing court); *see also CEMEX, S.A. v. United States*, 133 F.3d 897, 902 (Fed.Cir. 1998) ("Ordinarily, when a party fails to make an argument in proceedings below, the argument is waived, and we will not hear it on appeal.").

### CONCLUSION

The Court of International Trade did not err in sustaining the Final Remand Determination of Commerce that included Brazilian value-added taxes paid on input materials as a cost of materials in calculating the constructed value of ferrosilicon, because Minasligas failed to show that the taxes were fully recovered prior to exportation of the ferrosilicon that was produced from the taxed raw materials. The court also did not err in sustaining Commerce's choice of interest rate for determining imputed negative, United States credit expenses. Accordingly, the decision of the Court of International Trade is affirmed.

### COSTS

Each party shall bear its own costs.

*AFFIRMED*.