200 F.3d 771 (Fed. Cir. 1999)
 CAMARGO CORREA METAIS, S.A. Plaintiff,
and
CAMPANHIA BRASILIERA CARBURETO DE CALCIO, RIMA ELECTROMETALURGICA, S.A., and LIGAS DE ALUMINIO, S.A., Plaintiffs,
v.
UNITED STATES, Defendant-Appellant, and AMERICAN ALLOYS, INC., GLOBE METALLURGICAL, INC., and AMERICAN SILICON TECHNOLOGIES (formerly Silicon Metaltech, Inc.), Defendant-Appellants,
and
SIMETCO, INC., Defendant.
 99-1191, -1192
 United States Court of Appeals for the Federal Circuit
 DECIDED: December 21, 1999
 
 Appealed from: United States Court of International Trade Senior Judge R. Kenton Musgrave
 Reginald T. Blades, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant, United States. With him on the brief were David W. Ogden, Acting Assistant Attorney General and David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel for Import Administration; Elizabeth C. Seastrum, Senior Counsel; and David R. Mason, Jr., Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.
 Martin Schaefermeirer, Baker & Botts, L.L.P., of Washington, DC, argued for defendants-appellants, American Alloys, Inc., et al. With him on the brief were William D. Kramer, and Kirk K. Van Tine.
 Before MAYER, Chief Judge, MICHEL and CLEVENGER, Circuit Judges.
 MAYER, Chief Judge.
 
 
 1
 American Alloys, Inc., Globe Metallurgical, Inc., American Silicon Technologies (formerly Silicon Metaltech, Inc.), and the United States (collectively "domestic producers" or "appellants") appeal the judgment of the United States Court of International Trade, 91-09-00641 (November 5, 1998), affirming the International Trade Administration, United States Department of Commerce's ("Commerce") use of section 773b(e)(1)(A), of the Tariff Act of 1930, as amended, 19 U.S.C. section 1677b (e)(1)(A) (1988) ("section 1677b"), in determining the dumping margins for silicon metal from Brazil. See Silicon Metal from Brazil: Final Results of Redetermination Pursuant to Court Remand, No. 91-09-00641, slip op. 97-159 (March 25, 1998) (Determination III). The sole question presented in this appeal is whether section 1677b requires the inclusion of Brazilian value-added taxes when determining the constructed value of exported goods.[1] We hold that it does, and therefore reverse and remand.
 
 Background
 
 2
 This case has had an arduous history. As a result of allegations made by domestic producers of silicon metal, Commerce initiated an investigation on September 13, 1990, examining claims that Camargo Correa Metais, S.A. ("CCM"), Companhia Brasileira Carbureto De Calcio ("CBCC"), Rima Eletrometalurgia, S.A. ("RIMA"), and Ligas De Aluminio, S.A. ("Ligas") (collectively "Brazilian producers" or "appellees"), were selling their products at less-than-fair-value. See Initiation of Antidumping Duty Investigation: Silicon Metal From Brazil, 55 Fed. Reg. 38, 716 (Sept. 20, 1990). Following an extensive investigation, Commerce found that the Brazilian value-added tax, the "imposto sobre a circulacao de mercadorias e servicos" ("ICMS"), paid by CBCC and CCM on materials used to produce silicon metal was not remitted or refunded upon exportation of their product. See Final Determination of Sales at Less Than Fair Value; Silicon Metal from Brazil, 56 Fed. Reg. 26977, 26984 (1991) (Determination I). Accordingly, the ICMS was included in Commerce's calculation of the constructed value as a cost of production. See 19 U.S.C. § 1677b (e)(1)(A).
 
 
 3
 In a consolidated action brought in the Court of International Trade, the Brazilian producers challenged Commerce's determination. The court held that Commerce had incorrectly calculated the constructed value and remanded the case with instructions to, "account for the economic reality that ICMS that is paid on inputs to export production, and recovered from taxes otherwise due the Brazilian government, is not a cost of producing silicon metal for export in Brazil." Camargo Correa Metais, S.A. v. United States, 17 C.I.T. 897, 910 (Ct. Int'l Trade 1993) (Camargo I). On remand, Commerce recalculated the constructed value, excluding the ICMS paid by CBCC and CCM, pursuant to the trial court's instruction. See Final Results of Redetermination Pursuant to Court Remand, (Dec. 12, 1993) (Determination II). On April 17, 1995, the court summarily affirmed Commerce's revised determination, without any factual findings, conclusions of law, or reasons for its decision. See Camargo Correa Metais, S.A. v. United States, No. 91-09-00641, 1994 WL 162558 (Ct. Int'l Trade 1994) (Camargo II). Consequentially, in Camargo Correa Metais, S.A. v. United States, 52 F.3d 1040 (Fed. Cir. 1995), we vacated the trial court's decision and remanded the case for failing to comply with 28 U.S.C. § 2645(a).
 
 
 4
 Upon remand, Commerce sought a rehearing to have its original methodology reinstated. Commerce argued, contrary to the trial court's ruling in Camargo II, that the ICMS is not remitted or refunded upon export. Denying Commerce's request, the court held that it "has found the ICMS credit to be indistinguishable from a remittance or refund." Camargo Correa Metais, S.A. v. United States, No. 91-09-00641, 1997 WL 736715, *13 (Ct. Int'l Trade 1997) (Camargo III). Once again, the Court of International Trade remanded the issue to Commerce and instructed it to "(1) consider the [ICMS] to be a rebate or remittance for the purposes of the cited statutes, (2) propose a method to eliminate or account for the double counting problem, and (3) recalculate the dumping margin for plaintiff CBCC accordingly." Id. at 28. On March 25, 1998, after calculating the constructed value exclusive of ICMS, Commerce determined dumping margins identical to those reached in Determination II. See Determination III. After finding Determination III to be consistent with its remand order, the court affirmed Commerce's redetermination. See Camargo Correa Metais, S.A. v. United States, No. 91-09-00641, 1998 WL 782013 (Ct. Int'l Trade 1998) (Camargo IV). This consolidated appeal followed.
 
 Discussion
 
 5
 "We review a decision of the Court of International Trade affirming or reversing the final results of an administrative review de novo." AIMCOR v. United States, 141 F.3d 1098, 1108 (Fed. Cir. 1998); see Torrington Co. v. United States, 82 F.3d 1039, 1044 (Fed. Cir. 1996). We therefore use the same standard of review the Court of International Trade is required by statute to apply. See Campbell Soup Co. v. United States, 107 F.3d 1556, 1559 (Fed. Cir. 1997). Determinations made by Commerce will be upheld unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1988). For purposes of review, within the context of antidumping decisions, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). We decide the proper interpretation of governing statutory provisions de novo. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994).
 
 
 6
 In construing a statute or regulation, we begin by inspecting its language for plain meaning. See Bazalo v. West, 150 F.3d 1380, 1382 (Fed. Cir. 1998). If the words are unambiguous, no further inquiry is usually required. See Cox v. West, 149 F.3d 1360, 1363 (Fed. Cir. 1998). If a statute is silent or ambiguous about a matter, the court gives deference to interpretations by the agency charged with the duty to administer it. See Nationsbank v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256 (1995) ("'it is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute.'").
 
 
 7
 The disputed provision of section 1677b says that constructed value of imported merchandise shall be the sum of, among other things, the cost of materials, exclusive of " . . . any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used. . . ." 19 U.S.C. § 1677b(e)(1)(A) (1988) (emphasis added). This language raises two issues dispositive of its interpretation: the first is timing, and the second relates to the interpretation of the terms "remitted" and "refunded," and whether the Brazilian practice of conditioning recovery on the sufficiency of domestic sales precludes producers who export all or most of their products from ever having internal taxes excluded from the constructed value determination.
 
 
 8
 As for the timing required by section 1677b, AIMCOR controls. In that case, a Brazilian producer of ferrosilicon challenged, inter alia, the inclusion of Brazilian value-added taxes as part of the cost of materials in determining constructed value. See 141 F.3d at 1098. AIMCOR turned on whether the Brazilian system of using accrued credit to offset domestic tax liabilities could lead to ICMS being excluded from constructed value. We held that the term "'[r]efund' means 'to give or put back . . . to return (money) in restitution, repayment, or balancing of accounts,' and 'remit' means 'to let go back, send back.'" Id. at 1109 (quoting Webster's Third New International Dictionary 1910, 1920 (1986)). In light of the unique features of the Brazilian tax scheme, we held that the Court of International Trade correctly sustained Commerce's methodology which included ICMS value-added taxes in the cost of materials in calculating constructed value. Id. at 1110. We expressly said that "the Brazilian system of keeping a running total of taxes paid and collected and then 'settling up' monthly with the Brazilian government does not seems [sic] to meet the literal requirements of the statute in terms of refund and remittance." Id. at 1109. In other words, we found it hard to reconcile the system of using credit to offset future tax liabilities on products potentially unrelated to those exported, with the qualifying words "upon exportation" present in section 1677b. As in AIMCOR, we see no reason to depart from the straightforward wording of section 1677b. Therefore, unless ICMS are remitted or refunded "upon exportation", they are properly included in the constructed value of the exported merchandise.
 
 
 9
 By holding that receipt of credit was somehow the equivalent of a direct refund or remittance, the trial court ignored Commerce's determination that recovery of ICMS warranting exclusion from constructed value under section 1677b is contingent upon the level of participation in Brazil's domestic market. Commerce found that "Brazil's VAT system does not provide for a refund of ICMS taxes paid based upon export sales. Rather, in Brazil's system only a tax credit arises on the purchase of inputs (typically on materials and electricity) for use in the finished product. That credit can be used to offset tax liability to the government arising from sales in the domestic market (i.e., ICMS tax collected from domestic consumers)." See Determination III. Therefore, not only is the accrual of credit unrelated to exportation, but a producer who exports most, if not all its product, may have no domestic tax liability against which to apply its credit. As the trial court itself explained in Camargo I, "No provision is made under the ICMS scheme for refunds. Thus, if the ICMS paid on production exceeds the amount collected for domestic sales, then the company receives a credit for the difference, but no refund." 17 C.I.T. at 906. None of the appellees claimed that the ICMS in question was remitted or refunded upon, or by reason of, exportation of the merchandise. The ICMS are properly included in the constructed value calculation.
 
 Conclusion
 
 10
 Accordingly, the judgment of the Court of International Trade is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 REVERSED AND REMANDED
 
 
 NOTES:
 
 
 [1]
 The antidumping statutes were amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"). Because Commerce's investigation in this case was initiated in 1990, this appeal is governed by the antidumping law in effect prior to the 1994 amendments. For convenience, we refer to the law in the present tense.